ANITA CARTER *v.* COUNTY OF HAWAII.

No. 4174.

July 19, 1963.

Tsukiyama, C. J., Cassidy, Wirtz,
Lewis and Mizuha, JJ.

OPINION OF THE COURT BY CASSIDY, J.

This is an appeal from a judgment in favor of the defendant, County of Hawaii, in an action for damages caused by the flooding of a residential building on plaintiff-appellant's property opposite the county's Eugene S. Capellas Park, formerly known as the Puueo Park. The case was tried without a jury.

The flooding resulted from the rupture on plaintiff's property, on December 9, 1954, of a storm drain having its main intake in the park. Similar breaks of the drain had occurred in 1949 and 1950. Claims for damages on those occasions were settled by compromise and paid by the county. The county also undertook repair of the 1949 and 1950 ruptures.

The park lies mauka (west) of Wainaku Street which runs north towards Hamakua and south towards Hilo. Iliahi and Lehua Streets end at their junctures with Wainaku Street. Plaintiff's property is the lot on the mauka-Hilo (southwest) corner of the block bounded by these streets.

The drain directly involved in this action (which we will refer to throughout as "the" drain) starts in the northwest sector of the park and runs in a makai (easterly) direction through the park, under Wainaku Street, across plaintiff's property in a curve to the right, under Iliahi Street, and then discharges into an open ditch. It is made up of three separate and distinct segments.

The middle section of the drain is a 3-by-3-foot sturdy concrete box culvert, which starts at a point in the park designated as B-1,[1] located about 240 feet mauka of its Wainaku Street boundary. This culvert runs under Wainaku Street and into plaintiff's lot for a distance of ap-

---

[1] This designation and other similar designations of points referred to correspond to those used in a copy of the grading plan for Puueo Park, in evidence as plaintiff's Exhibit B.

proximately 20 feet, where it connects with the lower section of the drain.

The lower section of the drain is an underground conduit approximately two feet high and three feet wide, constructed with loose-rock sides and top. The plaintiff's house rests on the ground over this section of the drain. In the vicinity of plaintiff's house, the top of this section of the drain is five feet below the surface of the ground. The top is slightly arched. It was made of large rock spans with smaller rocks wedged in between them, all closely fitted and held together on top of the side walls by their own weight and the weight of the soil above. No mortar was used in constructing this portion of the drain.

It was stipulated that the box culvert and the loose-rock section of the drain were installed more than 50 years ago by private parties and that, "Prior to 1930 the drain was adequate to handle the surface water draining from Wainaku Avenue and points above without bursting, but sometimes it could not actually take or handle all of the surface water." No contention is made that the maintenance and use of the box culvert, as it existed when and after the county took over the park site, was in violation of the lower owner's rights.

The upper section of the drain is a concrete pipe 36 inches in diameter. It is connected to the box culvert at B-1 and runs 70 feet to a point, designated B-3-a, which is 50 feet from the mauka boundary and 165 feet from the Hamakua (north) boundary of the park. This section was installed by the county, in 1946.

The elevation of the new intake at B-3-a is 72.2 feet. Prior to the construction of the park and the installation of the 70-foot concrete pipe extension, the old drain had two intakes, one at B-1 and the other at a point, designated A, about 90 feet to the east of B-1. The intake at A was

sealed when the extension was connected to the box culvert at B-1.

There are three small intakes on Wainaku Street which empty into the drain. Two are at the opposite curbs of the street directly over the drain. The third is located at the mauka curb approximately opposite the southern boundary of Iliahi Street. These intakes are all marked B-2 on Exhibit B.

It was stipulated on pretrial hearing that the drain follows the line of a natural watercourse. This is also fully evident from plaintiff's Exhibit C, a contour map prepared in 1936 showing the topography at that time of the present park site and the area in the vicinity west of it. The exhibit indicates that the watercourse in which the drain was laid runs in a ravine which extends a considerable distance above the park. By reason of the terrain adjoining the ravine the watercourse takes the natural runoff from an extended area.

In 1948 the county completed development of the four-and-three-quarter-acre park.[2] According to Exhibit B, the park was to be graded from an elevation of 78 feet at its makai boundary above the sidewalk on Wainaku Street in a gradual uniform slope to an elevation of 85 feet at its mauka boundary. The exhibit shows that with the exception of a very limited area in the vicinity of the Hilo (south) end of the mauka boundary the slope of the park site along and from that boundary prior to development was towards the watercourse in which the drain was laid. The plan provides for 0% slope in both north and south directions from the center line of the park. It shows eleva-

---

[2] The park is trapezoidal in shape. Its depth is 340 feet and its makai and mauka boundaries are parallel and 633 and 579 feet long, respectively. The intake opposite the southern boundary of Iliahi Street is 310 feet from the southeastern corner of the park. The drain crosses the makai boundary of the park 215 feet from its northeast corner.

tion of the intake at B-3-a as 72.2 feet. While it cannot be determined from the plan itself, testimony and admissions (tacit, at least) of the parties warrant the finding that when the grading of the park was completed the elevation of the ground just makai of the intake at B-3-a was raised to about 83.6 feet in such a manner as to form a dam below the intake and that the dam so formed had the effect of increasing the head of water which could be impounded above the intake by about two and one-half feet over the head which could have been produced from water impounded at maximum height by the dam formed by the terrain below points B-1 and A when the principal intakes for the drain were at those points. This appears to have been accepted by the parties and the court. It apparently was also inferred and accepted that the water above the intake at B-3-a had reached such maximum height each time the drain ruptured. If the inference is warranted it would mean that the level of the water in the dam was approximately 11 feet above the intake on those occasions.

In 1951 the county installed a second underground drain consisting of a 36-inch concrete pipe with its intake approximately 20 feet directly mauka of point B-3-a. This drain runs diagonally across the park in a southeasterly direction to a culvert under Wainaku Street and discharges into an open ditch.

The only direct testimony bearing on what occurred on December 9, 1954, was the rather sketchy testimony of Mrs. Wanda C. Tolson, who lived in the basement apartment of plaintiff's house. This witness stated that when she left home at about 8:00 a.m. that day it was raining, as it had been the day and night before, but that she noticed nothing to be concerned about. She said that she returned about an hour later and that from Wainaku Street "the park was like a lake with water clear up into the cane fields." She "couldn't see any of the park—it was

all water back into the ravine." She could not tell what the level of the water was as it extended back into the ravine, but she said, "It was alarming to me." She said when she looked down from Wainaku Street into plaintiff's yard, "It looked like a fountain" and that "I realized something had broken; I didn't know what, but there was a fountain." She said the fountain was a few feet mauka of the house. When she went into her apartment the water was ankle high but it rose rapidly and was up to the top of her stove in a matter of minutes. According to her testimony, all the water came from the fountain—there was no spillover from either Wainaku or Iliahi.

The only other witness testifying with direct knowledge of any of the floodings was the plaintiff's husband, Milton H. Carter, who had lived with her on the premises from 1929 until 1952 when they moved to Honolulu. He said in respect to both the 1949 and 1950 breaks that the drain "exploded" and that when he looked toward the park "It was just a mass of water, just like a lake extending all the way back—as far back as I could see there." He asserted that each of the three breaks had occurred at the same or approximately the same place in the drain. He said that when he visited the property about two weeks after December 9, 1954, "There was this large exposed puka or hole that had obviously been caused by the same eruption of the drain in approximately the same location." He did not actually see where the 1954 rupture had occurred since no excavation was made to expose the drain after that break, as had been done on the two previous occasions. The depression in the earth caused by the 1954 rupture was merely filled with rubbish.

Mr. Carter also gave testimony relative to the compromise settlements of his wife's claims for the 1949 and 1950 breaks. He said that the repair of the drains was part of the "over-all claim adjustment." It was his testi-

mony that on each occasion the then county engineer had given assurance "that he was going to fix it up so we would never worry." He testified that there was no spill-over of water into his wife's yard from either Wainaku or Iliahi Street in 1949 or 1950. In answer to a question by the court relative to his wife's property, Mr. Carter admitted that "much of the portion of the yard is a sump —it sits in a hole." He also admitted that both he and his wife had knowledge that a natural watercourse or stream formerly ran through the property.

Appellant presses her contended right of recovery against the county on several alternate grounds or theories. The first involves application of the law set out in *Hamilton* v. *County of Hawaii*, 40 Haw. 193, at p. 194, as follows:

"The common-law doctrine is that surface water is a 'common enemy'; that causing surface water to flow in its natural direction through a ditch on one's own land, instead of over the surface or by percolation as formerly, where no new watershed is tapped and no addition to the former volume of surface water is caused thereby, is not a wrongful or unlawful act. (56 Am. Jur., Waters. § 73, pp. 559, 560.) However, an important limitation upon such right is that the owner of property may not drain into a stream or natural watercourse or drainway, surface waters which other-wise would not flow in that direction nor upon the servient lands. (56 Am. Jur., Waters, § 74, p. 561; 28 A. L. R. 1262, annotation.)"

While the complaint in this action is framed to rest plaintiff's claim for recovery primarily on the ground that the county had violated the stated limitation prohibiting a dominant owner from diverting into a natural drainway or upon servient lands surface waters which would not otherwise flow in that direction or upon such lands, the

proof fails to sustain a right to recovery on that basis.

The evidence indicates that over the course of recent years there has been a progressive increase in the amount of water flowing into the drain after heavy rains. This has been due to the change in use of some of the lands above the park which were formerly in cane. But we see nothing in the record to support or permit a finding that any action of defendant in connection with the development of the park, with one possible exception discussed below, contributed to such increased flow.

The terrain of the park area prior to its development is shown by contours and a grid of spot elevations on Exhibit B. The case was presented on both sides on the assumption that, aside from the area in the immediate vicinity of B-3-a, the park was graded according to the plan. Assuming the accuracy of the contours and spot elevations and of the proposed elevation changes shown on Exhibit B, it quite clearly appears that, with the exception to be considered, the change in terrain made by the grading of the park would not and did not cause diversion into the drain of any surface waters, either originating in the park or flowing onto it from the area and ravine above, which formerly would not have naturally flowed into the watercourse in which the drain was laid.

It is also clear that the runoff from the park of all waters not discharged through the two drains was onto Wainaku Street, and that the curb of that street and the adjacent sidewalk area were high enough to prevent any water from flowing directly from the street onto plaintiff's lot.

In the vicinity of plaintiff's property the natural flow on Wainaku Street from the Lehua Street intersection is in a southerly direction towards and down Iliahi Street. It is appellant's contention that, as a result of the development of the park, surface waters from the area opposite

Iliahi Street which formerly would have flowed south on Wainaku Street, flowed north and into the Iliahi Street B-2 drain. This is the exception referred to above. We are not convinced from examination of the exhibits relied on by appellant that the development of the park produced the claimed effect. Even if any such diversion were possible in this area it would necessarily be of little magnitude and effect. The area from which any diverted waters would flow is very limited. The assistant engineer of the county testified that the opening of the B-2 intake at the head of Iliahi Street is only eight inches square, that is, less than half a square foot in area. The volume diverted by the 1951 36-inch drain from the flow that formerly would have gone into the drain under plaintiff's property would greatly exceed and offset any increase in the load through the Iliahi Street B-2 intake that could possibly be caused by the grading of the park above that intake. In our opinion this B-2 intake does not appreciably affect any of the issues to be decided.

While we may agree with appellant that some of the lower court's specific findings of fact are erroneous, we find no reason for rejecting or questioning the court's ultimate conclusion that liability cannot be fastened upon the county on the theory that it had wrongfully diverted surface waters into the drain which otherwise would not have flowed through it.

Another ground alleged for relief is based on plaintiff's contention that the county negligently repaired the drain after the two earlier ruptures and that such negligence was the cause for the rupture and damage upon which the present action is predicated. It was stipulated in respect to each of the first two ruptures that "The Defendant undertook to repair the portion of the drain which so burst." There is nothing in the record to warrant a conclusion that any obligation was imposed upon

or assumed by the defendant to repair or otherwise work on any portion of the drain not covered by the stipulation. Therefore, in order for the plaintiff to maintain her alleged cause of action based on negligence in repairing the drain, she had the burden of first proving that the 1954 rupture occurred in the same place as the other two ruptures or either of them. In concluding that plaintiff had not sustained the burden of proof in that respect, the court stated: "There was no evidence to support the proposition that any of the three burstings, that in 1949, that in 1950 or that in 1954, were in the same spot although there was evidence to support the proposition that they were in the same general vicinity. After the bursting in 1954, the drain was never opened and there was trash thrown in the remaining depression so that the exact location of the rupture was never determined." Appellant, relying principally on Mr. Carter's testimony, claims that the court's finding and conclusion are erroneous.

It is apparent that Mr. Carter was attempting to establish that all three ruptures occurred in the same spot. However, his testimony was quite equivocal in that respect. He stated at one time that the ruptures occurred at the same spot, and then qualified his testimony by stating that the two ruptures he observed were "in approximately the same location" or "practically at the same location." Of course, neither he nor anyone else could have spotted the location of the 1954 break with any degree of accuracy since the drain was not exposed at any time after that rupture.

Plaintiff's Exhibit A shows a marking over the drain five and one-half feet long, labeled "Rupture," one end of which is located seven feet from the house and the other four and one-half feet from terminus of the box culvert. Exhibit A was prepared in 1955 and admitted in evidence at pretrial, the pretrial order merely reciting

that it was a "Map print showing probable line of drain under Plaintiff's premises." Nothing in the record shows who determined the placement of the marking on the exhibit nor does the exhibit specify which rupture the marking was intended to refer to. Mr. Carter did testify, however, that both the 1949 and 1950 ruptures occurred at the point marked "Rupture" on Exhibit A.

The testimony of Mrs. Tolson was that the 1954 rupture occurred "a few feet" from the house. The agreement of the parties noted in the pretrial order was that: "In November of 1950, the drain again burst adjacent to the point of bursting of January 8, 1949" and that, in 1954, "the drain again burst adjacent to the point of the two previous burstings." Photographs in evidence show the excavation made for repairs after the 1950 rupture with the drain exposed for 15 feet or more above the house. From these photographs it appears that the repair of the 1949 rupture was intact. It also can plainly be seen that the 1950 rupture was caused by the dislodgment of some of the small interstitial rocks in a short stretch of the drain immediately makai of the repaired portion. One of the photographs has a notation over the portion where the 1950 rupture obviously occurred reading, "Portion where leaks occurred. Portion to be repaired with concrete slab." Over the area of the 1949 rupture is the notation "Concrete slab found to be in good condition."

We find no error in the court's conclusion to the effect that the evidence would not support a finding that the 1954 rupture occurred in any portion of the drain previously repaired by the county.

Still another theory of recovery advanced by appellant is that the county adopted the drain as a part of its public drainage system; that it thereby became responsible for the drain's proper maintenance; and that plaintiff's

damages resulted from defendant's negligence in that respect.

We agree with the statement of the general rule quoted by appellant from 3 Yokley, *Municipal Corporations,* § 477, p. 134, "that a municipality becomes responsible for maintenance, and liable for injuries resulting from a want of due care, in respect to the upkeep of drains and culverts constructed by third persons when, and only when, they are adopted as a part of its drainage system, or the municipality assumes control and management thereof." It might be noted that the text continues as follows: "A natural corollary to this rule is that there is no municipal responsibility for maintenance and upkeep of drains and culverts constructed by third parties for their own convenience, and the better enjoyment of their own property, unless such facilities be accepted or controlled in some legal manner by the municipality."

We also accept as sound the quotation offered from 18 McQuillin, *Municipal Corporations,* 3d ed., § 53.118, p. 468, as follows:

> "* * * if * * * drains or culverts constructed by third persons are, in some legal manner, adopted by the municipality as a part of its * * * drainage system, *or the municipality assumes control and management thereof,* the municipality becomes liable for injuries resulting therefrom, since in such cases it is immaterial by whom the * * * drain or culvert was constructed."
> (Appellant's emphasis.)

However, we find no factual basis on this record to justify imposing liability on the county under any of the principles of law referred to.

There is no evidence of any express dedication of an easement for a drain through plaintiff's property by her or by any predecessor in title. Nor is there any evidence tending to show intention on the part of the board of

supervisors of the county or of any other county official with proper authority to act, to take over the drain on her property. There is likewise no support in the record for appellant's contention that adoption by the county may be implied under the theory that it had assumed control and management of that section of the drain. The claim in respect to the latter is in effect that the defendant's use of plaintiff's drain and its repair thereof after the 1949 and 1950 ruptures constituted such control and management as to amount to an adoption.

The county's use of the portion of the drain on plaintiff's property was in the exercise of its rights as a dominant owner draining off surface waters into the substitute created by one of plaintiff's predecessors in title for the natural open drainway which had formerly run through the property. The entries by the county's agents to repair the 1949 and the 1950 ruptures cannot be taken as indicative of any assumption of general control or management over the drain since they were made only for the purpose of fulfilling the limited obligation imposed on or assumed by the county in the compromise settlements made for the first two breaks. At most, what we have here amounts to little more than the casual making of repairs to a private drain by a municipality, and that is not sufficient to constitute an adoption. *Munn* v. *Mayor, &c., of Pittsburgh*, 40 Pa. 364. See also *City of Irvine* v. *Smith*, 304 Ky. 868, 202 S.W.2d 733; *Papac* v. *City of Montesano*, 49 Wash. 2d 484, 303 P.2d 654; *City of Maysville* v. *Brooks*, 145 Ky. 526, 140 S.W. 665.

The holding in *Munn* v. *Mayor, &c., of Pittsburgh* seems applicable to this case in several respects. In that case the court held the city not liable for damages caused to a property owner's mill from the collapse of a covered drain over which the mill had been built. The covered drain was a substitute for a formerly existing natural

drainway. The city's sewer system was connected to it. The court stated, at p. 370, as follows:

"* * * The sewer was not built by them [city officials], and it was not upon any lands of which they had the control. It was the property of the Commonwealth, or of the Pennsylvania Railroad Company, to whom the Commonwealth sold, and it was upon ground belonging to private owners, the plaintiffs and others, ground upon which the defendants had no right to enter. It is argued that by connecting their own sewer with it, the defendants adopted it as their own. And again, that inasmuch as it was shown that on several occasions they had made some slight repairs to it, they may be considered as having assumed the obligation to maintain it. The argument loses sight of the fact that the sewer is the substitute for 'Suke's Run,' is in fact 'Suke's Run' itself. Into that run the city had a right to pour its sewers and drains, without being under any obligation to keep it clear to its mouth, on the private property of all the lotholders through which it flowed. This right it could not lose by the fact that the lot-owners, or some one else, had conducted the run through a covered passage-way. Conveying the water of their own sewer into the old state sewer was, therefore, but the exercise of a right burdened by no obligation. It no more imposed upon them the duty to maintain the old sewer than their conducting the water into the run, before the Commonwealth interfered with it, would have compelled them ever after to keep the run clear to its mouth.

"Nor can the repairs of the old sewer, occasionally made by the defendants, be regarded as any evidence of their voluntary assumption of the duty of maintaining it. * * *."

The court committed no error in finding that the county had not adopted the drain.

As another ground for recovery appellant contends that the damage caused to her property was due to the county's negligence in extending the drain and leveling the park at its intake without first making a survey or examination of her drain. In this connection it is specified that: "The court erred in its finding and conclusion that increasing the pressure in the drain brought by the defendant's raising the level of the land (and thus the water) at point of intake from 80.9 to 83.6 feet without checking the condition of the drain on the plaintiff's property, was not a negligent act on the part of the defendant." Closely allied to this point is appellant's contention that, irrespective of whether the county was negligent in installing the extension of the drain, its action in creating the dam and increasing the head by two and one-half feet in and of itself made it liable for the bursting of the drain. We are unable to agree with either contention.

In our view of the evidence there has not been sufficient proof of causal relation between the raising of the head two and one-half feet and the rupture upon which the action is predicated. While it is undoubtedly true that the drain ruptured on each of the three occasions for the same reason, we are unable to agree with appellant that, because there was no history of any prior rupture of the drain, the fact that the three successive ruptures occurred shortly after the development of the park was sufficient to warrant holding the county liable for the third rupture.

Plaintiff's expert, L. S. Williams, testified in answer to a comprehensive hypothetical question embodying most of the details given in evidence on the history of the area and the development of the park that, in his opinion, the increase in head was the cause of the bursting of the drain.

However, the question was framed and his answer appears to have been given on the assumption that the dam created in the grading of the park in 1948 increased the maximum head in the drain over what it had been by some 11 feet (being the full difference between the intake elevation of 72.2 feet and the estimated elevation of the height of the newly created dam at 83.6 feet), whereas, as we have noted, the actual increase was only 2.5 feet.

We are also unable to follow or accept appellant's argument that negligence can be imputed to the county for having installed the extension and increased the head without checking the condition of the drain on her lot. As has been related, the drain had been constructed 50 or more years before, by parties unknown and at a time when both the dominant and the servient lands were held under private ownership. It was laid in a natural watercourse which the lower owner had no right to obstruct in such a manner as to prevent the free flow of water from above. When the defendant installed the 36-inch concrete pipe at the upper end of the drain and connected it to the sturdy 3-by-3-foot box culvert, it is obvious that the extension itself created a reduction in the rate of flow through the drain, the cross-sectional area of the pipe being 7.06 square feet as compared to 9 square feet for that of the box culvert. Under the circumstances we think it would be unreasonable to hold the county, as appellant in effect contends, to a degree of care which would have required it to have foreseen that any portion of the lower drain might not be able to withstand the increase in pressure resulting from the two-and-one-half-foot increase in head that was caused by the grading of the park.

Moreover, the county was entitled to use reasonable means in developing its property, and to rid itself of surface waters coming onto the property. The elevation of the water at the dam at highest level when the intakes

were at B-1 and A was approximately 81 feet. The elevation at the beginning of the loose-rock drain is 69 feet. The elevation where the loose-rock drain passes under plaintiff's house is 64 feet. Since the rock drain is five feet beneath the surface, its mean elevation between the house and the beginning of the loose-rock drain would be 61 feet. The maximum head of water that could be built up in the drain above plaintiff's house before the 70-foot extension was put in was therefore approximately 20 feet. It seems obvious, therefore, that in comparison with such head, the increase of two and one-half feet resulting from the development of the park was relatively insignificant. This conclusion, we think, finds full confirmation in the testimony of Mr. Williams. While, as we have seen, this expert's opinion that the increase in head was the cause of the drain's breaking was or may have been given on the erroneous assumption that the head had been increased by some 11 feet, he subsequently, in response to a direct question, testified that a two-and-one-half-foot increase in head would be of slight significance. It might also be noted in this connection, that in offering his opinion on direct examination relative to the cause of the rupture, Mr. Williams considered principles and pressures applicable to a static head and that although he later admitted on cross-examination that in a free-flowing pipe, the head, and consequently the pressure in the pipe, would be reduced by the flow, neither side made any effort to pursue this pertinent lead to ascertain how it might have affected his previous testimony.

In connection with the points now under consideration, appellant makes much of the fact that while the trial court had found that the construction of the park increased the pressure in the drain running under plaintiff's house, it went on to state: "However, the Court is not convinced that any part of the drain was acting as a pipe,

even when the park was like a lake, in view of the fact that there was only a one-foot difference in the cross-sectional area of the concrete pipe and the 2 x 3 foot portion of the drain, and the fact that the basins on Wainaku Avenue, totalling a cross-sectional area of at least four square feet, would act to relieve pressure in the drain."

We do not see any particular significance in the trial court's conclusion in the above respect, even though we do not concur in the reasons given for the conclusion that the drain may not have been acting as a pipe. We think there is no question but that on each of the occasions the drain at the point of rupture was full and under pressure and that the pressure caused it to burst. However, no testimony was given on whether, and, if so, to what extent the drain was flowing at its discharge outlet just beyond Iliahi Street when any of the ruptures occurred. It was and is therefore equally possible, and certainly no more speculative, to conclude that the pressure buildup in the pipe could have been due to the accumulation of silt, debris, or disintegration of the drain itself at some point under or below plaintiff's house. Any blockage or partial blockage, so caused, would necessarily have increased the pressure exerted by the water in the drain between the end of the box culvert and plaintiff's house when the drain was full. In this connection we think the most significant evidence in respect to the points now under consideration was the answer given by plaintiff's expert when he was asked to express his opinion on the soundness from an engineering standpoint of the construction of a drain which entailed tying in a loose-rock 2-by-3-foot underground conduit to a 3-by-3-foot concrete box culvert, as was done in this case. He gave it as his opinion that it was poor practice, and he said it was "almost bound to fail." He added: "That type of construction is not intended to

take any pressure whatsoever. It was intended to take a free flow like an open ditch." The county, of course, had no part in creating this hidden inherent defect in the drain.

We find no error in the trial court's conclusion that responsibility cannot be imputed to the county either on the theory that it was negligent in adding the 70-foot extension to the drain and increasing the attainable head above it without ascertaining the condition of the drain under plaintiff's property, or on the theory that the increase in attainable head by the increase in height of the dam below B-3-a directly made the county accountable for the consequences to plaintiff's loose-rock section of the drain due to the resultant increase of pressure in the drain.

The judgment is affirmed.

*Roy K. Nakamoto* (*Pence & Ushijima* of counsel) for appellant.

*Cyril S. Kanemitsu,* First Deputy County Attorney of Hawaii County (*Yoshito Tanaka,* County Attorney), for appellee.