## VINCENT E. RODRIGUES, JR. AND ADALINE RODRIGUES *v.* STATE OF HAWAII.

### No. 4833.

July 20, 1970.

RICHARDSON, C.J., ABE, LEVINSON, JJ., CIRCUIT JUDGE
HAWKINS IN PLACE OF MARUMOTO, J., DISQUALIFIED
AND CIRCUIT JUDGE LAURETA IN PLACE OF
KOBAYASHI, J., DISQUALIFIED.

OPINION OF THE COURT BY RICHARDSON, C.J.

In a suit instituted under the State Tort Liability Act, judgment was rendered against the State of Hawaii and in favor of Mr. and Mrs. Vincent E. Rodrigues, Jr., for damages caused to their home by surface waters overflowing a blocked drainage culvert.

Mr. and Mrs. Rodrigues are owners, as tenants by the entirety, of a houselot located in an improved subdivision

at Olowalu, Maui. The subdivision is in a flood plain bounded on the north by sugar cane fields which rise steeply to a mountainous region and on the south by a beach and the ocean. The State's Honoapiilani Highway runs along the Maui coast between the subdivision and the beach.

The Rodrigues' houselot is situated in a tier of lots separated from the highway by an unimproved parcel of land. On the Wailuku side (east) of the Rodrigues' houselot are the adjacent houselots of Mrs. Rodrigues' mother and uncle, Mrs. Kaahui and Mr. Kaaea. The contour of the land slopes gradually downward in an easterly, westerly, and southerly direction from the Rodrigues' lot. The culvert in issue is located approximately 150 feet south of the tier of lots and opposite the property line separating the Kaahui and Kaaea lots. The State highway is constructed at an elevation higher than the surrounding land, and the culvert runs under the highway, opening on to the unimproved parcel of land which separates the tier of lots from the highway and emptying on to the beach on the south side of the highway.

In 1959, Mr. Kaaea informed the State that the drainage culvert was often clogged and that during heavy rains surface water would accumulate on his land. The Maui District Engineer for the State Highway Department noted that the culvert outlet on the beach was often blocked by sand bars created by tidal action. He suggested that Mr. Kaaea telephone the highway department's maintenance department, "whenever he thinks a heavy rain will fall and ... a flood condition is imminent" but that it would "not be necessary for him to clear the channel himself."

The Rodrigueses began construction of their home in 1966 on the Olowalu lot and completed construction and

furnishing just prior to March 23, 1967. During this period of time the Rodrigueses were living in Wailuku with relatives and planned to move into their new home on March 24, 1967. Heavy rains fell on the Olowalu area during the evening of March 23 and the early morning hours of March 24.

The events which occurred during that time may be briefly summarized. At sometime between two and three o'clock in the morning on March 24, Mr. Kaaea telephoned Mr. Tokunaga, the maintenance superintendent of the highway department, to report that his home was in danger of being flooded. On his way west to Olowalu from Wailuku, Tokunaga encountered large boulders, mud, and rushing water at the Lahaina pali section of the Honoapiilani Highway which is located some distance east of Olowalu. After closing the highway, Tokunaga and a member of his maintenance crew continued along in the direction of Olowalu to Ukumehame, which is also located east of Olowalu. Obtaining a grader at Ukumehame, both men returned the way they had come clearing one lane of traffic. Tokunaga continued east past the Lahaina pali section to Maalaea then returned, clearing the highway from Maalaea to the Lahaina pali section. Tokunaga and a crew then proceeded to the culvert at Olowalu, beginning work there at approximately 7:30 a.m.

The Rodrigues' home was flooded to a height of six inches, the water causing extensive damage to the house and furnishings. Mr. Rodrigues reported that he was "heartbroken" and "couldn't stand to look at it" and Mrs. Rodrigues testified that she was "shocked" and cried because they had waited fifteen years to build their own home.

In addition to other repairs they made on their home, the Rodrigueses spent approximately six weeks scraping damaged rubber carpets off the floor of the house with

razor blades. The Rodrigueses took out a loan to pay for repairs and incurred interest charges on the loan as an additional expense.

The trial court found that the Rodrigues' lot occupied the highest ground in the tier of lots, that the floor of their house was two and a half feet higher than the top of the culvert, that the culvert was adequate to drain the area, and that flooding of the Rodrigues' home could have been prevented if "the State ... had men dig the culvert out whenever it became blocked by sand" or "if Tokunaga had proceeded directly to Olowalu after he had been called ... rather than spending four hours clearing the road."

Judgment amounted to $10,342.73 in the aggregate and consisted of $5,535.04 for repairs, labor, and loss of occupancy for four months, $2,307.69 for interest charges on the loan taken out by the Rodrigueses for the cost of repairs, and $2,500.00 for "mental anguish and suffering, inconvenience, disruption of home and family life, past and future, etc."

The State raises numerous points on appeal. They may be consolidated into four issues: (1) whether the maintenance of a culvert is a discretionary function within the exception stated in the State Tort Liability Act;[1] (2) whether the State, treated as a private individual under like circumstances,[2] owed a duty of due care to the Rodrigueses in the maintenance of its culvert; (3) whether the prohibition against the award of interest "prior to judgment" in HRS § 662-2 includes interest charges on

[1] HRS § 662-15(1) immunizes the government from liability for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state officer or employee, whether or not the discretion involved be abused."

[2] HRS § 662-2 states that: "The State hereby waives its immunity for liability for the torts of its employees and shall be liable in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages. . . ."

the loan incurred by the Rodrigueses, and (4) whether the award for "mental anguish and suffering, inconvenience, disruption of home and family life, past and future, etc." was proper.

## I.

We have recently adopted the view that the discretionary function exception does not apply to operational level decisions which involve routine everyday matters not requiring evaluation of broad policy factors. *Rogers* v. *State,* 51 Haw. 293, 459 P.2d 378 (1969). From the record, it is clear that the maintenance of highway culverts is an everyday governmental operation undertaken by the State to protect its highways from drainage waters.

The State's sole reliance on *Sisley and Shank* v. *United States,* 202 F. Supp. 273 (D. Alaska 1962) for the proposition that maintenance of a culvert is within the scope of the discretionary function exception is misplaced. True enough, there, the government's motion to dismiss an action brought under the Federal Tort Claims Act for damages caused by the alleged negligent failure of the government to provide "adequate" culverts was granted. "Adequacy" in *Sisley,* however, referred to the design of the culvert rather than the maintenance of an existing culvert, the court holding that the design of a culvert was a planning decision requiring the evaluation of broad policy matters. Indeed, where the government was held immunized from liability for the design of culverts, it was nevertheless held that the government's negligent failure to clear out an adequately designed culvert was not a discretionary act at the planning level. *Valley Cattle Co.* v. *United States,* 258 F. Supp. 12 (D. Haw. 1966).[3]

---

[3] We do not understand the State's argument to be based on the design of the culvert. since the trial court found that the culvert was adequate when cleared; to drain waters from the Rodrigues' lot. It is therefore unnecessary to express any opinion as to the persuasiveness of the *Sisley* or *Valley Cattle Co.* holdings pertaining to the immunization

The State's contention that the suit was barred by the statute of limitations was also based on the mistaken premise that the Rodrigues' claim rested on the design and construction of the culvert which had been completed some sixteen years before suit. Where the overflow of surface waters is caused by the obstruction of an adequately designed culvert, the statute of limitations begins to run at each overflow. *Schmutte* v. *State,* 147 Neb. 193, 22 N.W.2d 691 (1946). Since suit was filed within a month of the overflow of the Rodrigues' land, the trial court was correct in finding that suit was brought within the two-year limitation required under the State Tort Liability Act. HRS § 662-4.

## II.

Because the maintenance of a culvert is not a discretionary function, we must decide whether the trial court was correct in finding that the State, treated as an individual "under like circumstances," was liable under the law governing disposal of surface waters.

The State's position is (1) it does not owe a duty of due care to the Rodrigueses under the common enemy rule pertaining to surface waters; (2) if it does owe a duty, it

---

of the government from liability where the inadequacy of a culvert's design is foreseeable at the time of the design plan. In *Valley Cattle Co.,* the U.S. District Court for Hawaii denied governmental liability for the alleged negligent design of culverts, distinguishing the facts in Cabral v. City and County of Honolulu, 32 Haw. 872 (1933) and in F. Koehnen, Ltd. v. Hawaii County, 47 Haw. 329, 388 P.2d 214 (1963) on the ground that our decisions merely involved the diversion of surface waters. Nevertheless, in relying on *Cabral,* we said in *Koehnen* at 338, "In each case the defect in the bridge causing the damage complained of was an inadequacy of construction which obstructed and prevented surface waters from flowing naturally in a watercourse." *Cf.* Jemison v. The Duplex, 163 F. Supp. 947, 951 (S.D. Ala. 1958) where it was held that the decision to deepen a channel was discretion exercised on the planning level, but drawing the plans and specifications were acts on the operational level and the government was not given "*carte blanche* to draft plans and specifications for the dredging operations in negligent disregard for the rights of property owners." *See* United States v. Hunsucker, 314 F.2d 98 (9th Cir. 1962).

did not breach that duty; and (3) if it breached its duty the Rodrigueses were contributorily negligent or assumed the risk of the flood.

Three rules have been adopted by the states regarding the disposal of surface water: (1) the common enemy rule which confers an absolute privilege on the possessor of land to dispose of surface water without regard to harm caused to his neighbors; (2) the civil law rule which prohibits any change in the natural flow of surface water by the possessor of land; and (3) the reasonable use rule which allows each possessor of land to alter the flow of surface water so long as his interference with the flow is not unreasonable under the circumstances of the particular case.

An examination of the decisions reveals that the courts have fashioned qualifications for the common enemy rule and for the civil law rule based upon concepts of reasonable use. *See* cases collected at 59 A.L.R.2d 421. These qualifications tend to accomplish the same results in common enemy and civil law rule jurisdictions as the reasonable use rule explicitly points to. *See* Kinyon and McClure, *Interferences with Surface Waters,* 24 Minn. L.Rev. 891 (1940).

The State asserts that we are a common enemy jurisdiction and that it could "fend off surface waters as it sees fit without being required to take into account the consequences to other landowners." The State also asks that we resolve what it believes to be a conflict in our cases concerning the disposal of surface waters.

We have not, contrary to the State's assertion, adopted the strict application of the common enemy rule.[4] Fur-

---

[4] Gannon v. Hargadon, 92 Mass. (10 Allen) 106, 87 Am. Dec. 625 (1865), the leading American case on the common enemy rule, states that:

"Nor is it at all material, in the application of this principle of law, whether a party obstructs or changes the direction and flow of sur-

thermore, there is no conflict among the cases cited by the State. Our decisions did not depend upon mechanical adherence to strict rules, but upon the circumstances surrounding each case. In *Hamilton* v. *County of Hawaii*, 40 Haw. 193 (1953), we said an important qualification of the common enemy rule was that a possessor of land was not privileged to allow surface waters to overflow upon servient lands. In *Cabral* v. *City and County*, 32 Haw. 872 (1933) and in *F. Koehnen, Ltd.* v. *Hawaii County, supra*, 47 Haw. 329, 388 P.2d 214 (1963), we based liability on the failure of the county governments to provide adequately designed culverts when they changed the direction and flow of surface waters. We did not find the government liable in *Carter* v. *County of Hawaii*, 47 Haw. 68, 384 P.2d 308 (1963). The evidence did not sustain the claim that the government had unreasonably increased the flow of surface water through a natural waterway. We acknowledged there, that "the county was entitled to use *reasonable means* in developing its property." (Emphasis added.) Our decisions, then, allow possessors of land to guard themselves against the hazards of surface water so long as reasonable precautions are taken not to negligently injure others. We believe our decisions so closely approach the reasonable use rule that it is incumbent upon us to adopt it. We hold that each possessor of land may interfere with the natural flow of surface water for the development of his land so long as such inter-

---

face water by preventing it from coming within the limits of his land, or by erecting barriers or changing the level of the soil, so as to turn it off in a new course after it has come within his boundaries."

In contrast, we said in Hamilton v. County of Hawaii, 40 Haw. 193, 194 (1953) that:

". . . an important limitation upon such right is that the owner of property may not drain into a stream or natural watercourse or drainway, surface waters which otherwise would not flow in that direction nor upon the servient lands."

ference is not unreasonable under the circumstances of the particular case.[5] *Swett* v. *Cutts*, 50 N.H. 439, 9 Am. Rep. 276 (1870); *Enderson* v. *Kelehan*, 226 Minn. 163, 32 N.W.2d 286 (1948); *Armstrong* v. *Francis Corp.*, 20 N.J. 320, 120 A.2d 4 (1956); Restatement, Torts § 833 (1939).

Thus, while the State may take precautions to protect its highways from the hazards of surface waters, it has a duty to prevent unnecessary harm to neighboring lands which may result from such precautions.

One of the grounds on which the trial court based the State's liability was its failure to keep the culvert clear of sand. The State claims that it did not breach its duty in this regard. It contends that in light of its limited funds and manpower, it satisfied its duty by "periodically" inspecting the culvert. There was no evidence submitted to indicate how often such periodic inspections took place.

To support its claim the State introduced evidence to show that there were four maintenance crews in the Maui highway department, that each crew consisted of approximately ten men and was assigned to forty miles of highway; that there were "hundreds" as opposed to "thousands" of culverts along the State's highway and that it would take four men one hour to clear the culvert in issue.

No evidence of any situation similar to that at Olowalu was introduced. The record contains a weather summary of the Environmental Science Services Administration (U.S. Dept. of Commerce) which surveyed the damage on Maui during the storm period. The ESSA reported only two instances of damage that might be interpreted to support the State's position: the damage at Olowalu which

---

[5] The circumstances which may be considered include: the nature and importance of improvements made, the reasonable foreseeableness of the injury, the extent of interference with the water, the amount of injury done to other landowners compared to the value of the improvements.

is the subject of this case and damage in the Kihei area caused by the "inability of channels and road culverts to control the rain waters, and blockage of stream outlets at Maalaea Bay."

The situation at Olowalu was well known to the highway department. Additional calls for aid were made by Kaaea between 1959 and 1967. The department was aware that the culvert would remain clear of beach sand for two days to a week depending on the tidal condition and stated that there was "no necessity for keeping it clear except for the few times during the year when it rains." Yet no effort was made to employ an appropriate schedule of inspection in March, which was, as the ESSA reported, "wet on all the islands but Hawaii." The State had knowledge of the specific risk at Olowalu and from the facts, we cannot say that the trial court erred in finding that the circumstances required more than a periodic inspection of this particular culvert.

The State's defenses of contributory negligence and assumption of risk are based on two contentions. The first is that the Rodrigueses were aware of the likelihood of floods in the Olowalu area and assumed the risk of damage by building their home on a concrete slab floor four inches off the ground. The second is that Mr. Rodrigues was contributorily negligent by failing to report his discovery of the clogged condition of the culvert some two or three months before the flood. The State's contentions do not merit extended discussion. As to the first contention, there is ample evidence to support the trial court's finding that the culvert was adequate, when clear, to prevent the damage complained of. As to the second contention, we cannot find facts in the record that would connect Mr. Rodrigues' discovery of the blocked culvert some *two or three months* before his home was completed and he became a resident of Olowalu with the ultimate fact of damage, especially if

the State was, as it contends, "periodically" inspecting the culvert.

Finding no error of law, we hold that there is substantial evidence in the record to support the trial court's finding of negligence.

### III.

The general rule in measuring damages is "to give a sum of money to the person wronged which as nearly as possible, will restore him to the position he would be in if the wrong had not been committed." McCormick, Damages § 137 at 561 (1935). We may conclude on the facts that the expense of interest charges on the loan incurred by the Rodrigueses was attributable to the damage caused by the overflow of waters from the blocked culvert. We hold, therefore, that interest charges, as an incidental expense of a loan which is incurred by the claimant in good faith to mitigate damages, may be recovered as an item of compensatory damages in civil suits. *Vining* v. *Smith,* 213 Miss. 850, 58 So. 2d 34 (1952), *cf.* McCormick, *supra,* § 42 at 152.

The State does not raise any objection to treating interest charges as an item of proper compensation under the general law of damages. However, it contends that there can be no recovery for the expense of interest charges in this case because HRS 662-2 provides, in part, that the State "shall not be liable for interest prior to judgment." We find the State's interpretation of the term "interest" in this context too broad.

Our act, modeled on the Federal Tort Claims Act, makes another reference to interest. HRS 662-8 states that interest shall be computed *"on* all final judgments."[6] (Em-

---

[6] "§ 662-8 Interest. On all final judgments rendered against the State in actions instituted under this chapter, interest shall be computed at the rate of four per cent a year from the date of judgment up to, but not exceeding, thirty days after the date of approval of any appropriation act providing for payment of the judgment."

phasis added.) Accordingly, "interest" is used in the lim·ited sense of compensation for the delay of use of money due as damages.[7] We attribute the same limited meaning to "interest" in HRS 662-2. That a particular interpretation given to a word or phrase in one section of the statute may have an impact on the interpretation of the same word or phrase in another section should be clear and in the absence of an express intention to the contrary, words or phrases used in two or more sections of a statute are presumed to be used in the same sense throughout. *Gaspro, Limited* v. *Commission of Labor & Indus. Rel.,* 46 Haw. 164, 377 P.2d 932 (1962).

Further support is given the proposition that "interest" in HRS 662-2 refers only to compensation for delay in payment of money damages by HRS 661-8. HRS 661-8, referring to suits by and against the State, provides that "No interest shall be allowed *on* any claim up to the time of the rendition of judgment thereon by the court. . . ." (Emphasis added.) Laws upon the same subject are construed with reference to each other, *Parke* v. *Parke,* 25 Haw. 397 (1920). Interest on claims awarded for delay in payment and measured from the accrual of the claim for relief to the time of rendition of the judgment is known

---

[7] This is the interpretation apparently given similar provisions of the Federal Tort Claims Act. The revisor's note to 28 U.S.C. 2674 (on which HRS 662-2 is modeled) states that:

". . . the provision . . . that the United States shall not be liable for interest prior to judgment was omitted [from other sections] as unnecessary in view of section 2411 of this title, which provides that interest on judgments against the United States shall be computed from the date of judgment."

The revisor's note to 28 U.S.C. 2411(b) (on which HRS 662-8 is modeled) states that:

". . . the provisions . . . that 'the United States shall not be liable for interest prior to judgment' was omitted [from this section] as covered by the language . . . providing that interest shall be computed from the date of judgment."

The revisor's notes to the United States Code carry great weight in the construction of the section. United States v. Scott & Williams. 88 F. Supp. 531, 533 (S.D.N.Y. 1950) ; United States v. National City Lines, 337 U.S. 78, 81 (1949) ; Ex parte Collett, 337 U.S. 55, 57 (1949).

as prejudgment interest at common law and awarded at the discretion of the court.

Therefore, we hold that the prohibition against payment of interest "prior to judgment" in HRS 662-2 refers to compensation for the delay in payment of money damages which is measured from accrual of the claim for relief until final judgment and does not include interest charges which, as an actual expense, constitutes an item of such money damages.

The trial court awarded interest charges computed on the entire loan. While the record is not clear, it appears that the amount borrowed by the Rodrigueses was in excess of what was actually expended in "refurnishing and repairing" the house. The items of expense involved in furnishing and repairing the house as enumerated in the judgment fall short of the entire amount borrowed on which interest charges were computed. The issue was never raised or mentioned by the trial court or any of the parties. We remand to the trial court with instructions to make corrections where necessary to insure that recovery of interest charges were fairly computed.

## IV.

We turn to the trial court's award of damages of "mental anguish and suffering."

The traditional rule, based upon considerations of policy we discuss herein, is that there is no recovery for the negligent infliction of mental distress alone. *Lynch* v. *Knight,* 11 Eng. Rep. 854, 9 H.L. Cas. 577, 578 (1861); *Spade* v. *Lynn & Boston R.R.,* 172 Mass. 488, 52 N.E. 747 (1899).

The cases contain the broad statement that there is no duty to refrain from the negligent infliction of mental distress, *Spade, supra; Waube* v. *Warrington,* 216 Wis.

603, 258 N.W. 497 (1935). Thus the paramount issue is characterized as one of duty: whether the plaintiff's interest in freedom from mental distress is entitled to legal protection from defendant's conduct. Duty, however, is a legal conclusion which depends upon "the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." Prosser, Torts § 53 at 332 (3d ed. 1964). Therefore, in determining the duty imposed on the defendant, if any, we must weigh the considerations of policy which favor the plaintiff's recovery against those which favor limiting the defendant's liability.

We begin with the proposition that the interest in freedom from the negligent infliction of mental distress has in fact been protected whenever the courts were persuaded that the dangers of fraudulent claims and undue liability of the defendant were outweighed by assurances of "genuine and serious" mental distress. *Cf.* Prosser, *supra*, § 55 at 348. In drawing exceptions to the rule of no recovery, the courts have found such assurances in an accompanying physical injury or impact, host cause of action, or special factual pattern.

Where a host cause of action exists, recovery for the negligent infliction of mental distress is in the form of incidental or "parasitic" damages. Restatement Second, Torts § 47, comment b at 80 (1965). However, the parasitic approach has caused courts to find "that an independent [host] tort had been committed, no matter how technical or trivial ... [in order to] allow [parasitic] damages for mental suffering," *Fraser* v. *Blue Cross Animal Hosp.*, 39 Haw. 370, 373 (1952).

Even where a host cause of action accompanies a claim of damages for mental distress, the courts have been reluctant to award damages for mental distress unless it is accompanied by physical injury or the immediate threat

of physical injury to the plaintiff. *E.g., Beaulieu* v. *Great Northern Ry.,* 103 Minn. 47, 114 N.W. 353 (1907). This is especially true where the host cause of action is for injury to property. See the annotation at 28 A.L.R.2d 1070. *But see Rasmussen* v. *Benson,* 135 Neb. 232, 280 N.W. 890 (1938). Yet the negligent infliction of emotional distress has been treated as an independent tort rather than as a parasitic element of damages in cases involving the negligent handling of corpses and the negligent transmission of a telegraph message, likely on its face, to cause serious mental distress. Note, 17 Mich. L. Rev. 407 (1919); Prosser, Torts, § 55 at 348. Of course, the modern cases have abandoned the parasitic approach where the infliction of mental distress is an *intentional* act, relying on the element of outrage in such cases as a guarantee of genuine and serious mental distress. *Fraser, supra;* Restatement Second, Torts § 46, comment j at 78 (1965). It suffices to note that the parasitic approach represents law in a developing stage, *see* Street, I Foundations of Legal Liability at 470 (1906); and that the present scheme of protection for the interest in freedom from negligent infliction of mental distress is an uneven and inconsistent one.

We find little virtue in such a scheme.

As we have noted, the principle to be extracted from the exceptions is that they involve circumstances which guarantee the genuineness and seriousness of the claim. The better view is to treat such exceptions as examples of trustworthy claims deserving of legal redress and not as restrictions on the plaintiff's right to recover. We believe that the preferable approach is to adopt general standards to test the genuineness and seriousness of mental distress in any particular case.

We turn then to a consideration of the policies underlying the present scheme of protection.

Two primary considerations underlie the present limited scheme of protection: (1) the likelihood that courts will be flooded by fraudulent claims and (2) the defendant's potentially unlimited liability for every type of mental disturbance.

We place little weight on the first consideration. Courts which have administered claims of mental distress incident to an independent cause of action are just as competent to administer such claims when they are raised as an independent ground for damages. In judging the genuineness of a claim of mental distress, courts and juries may look to "the quality and genuineness of proof and rely to an extent on contemporary sophistication of the medical profession and the ability of the court and jury to weed out dishonest claims," *Ferrara* v. *Galluchio*, 5 N.Y.2d 16, 176 N.Y.S.2d 996, 152 N.E.2d 249 (1958). In cases other than where proof of mental distress is of a medically significant nature, *e.g., see* Smith, *Relation of Emotions to Injury and Disease,* 30 Va. L. Rev. 193 (1944); American Psychiatric Ass'n Diagnostic and Statistical Manual, Mental Disorders (1952); the general standard of proof required to support a claim of mental distress is some guarantee of genuineness in the circumstances of the case. *Cf.* Prosser, Torts § 55 at 349.

The second consideration poses a problem which is more complex, but we are not persuaded that the difficulty in drawing the limits of the defendant's liability precludes recognition of the plaintiff's claim. It is universally agreed that there are compelling reasons for limiting the recovery of the plaintiff to claims of *serious* mental distress. The reasons offered to limit recovery are that mental distress of a trivial and transient nature is part and parcel of everyday life in a community, that under certain circumstances social controls may deal more effectively with mental distress, that some kinds of mental distress may have

a beneficial therapeutic effect, that the law should not penalize the "prime mover" in society nor curry to neurotic patterns in the population. *E.g., see* Smith, *Relation of Emotions to Injury and Disease: Legal Liability for Psychic Stimuli,* 30 Va. L. Rev. 193, 228 n. 128, 234 (1944) ; Magruder, *Mental Disturbance in Torts,* 49 Harv. L. Rev. 1033, 1035 (1936) ; Goodrich, *Emotional Disturbance as Legal Damages,* 20 Mich. L. Rev. 497, 512 (1922). We believe these reasons are to be considered by the jury and the court with the particular facts of each case in applying the "reasonable man" standard we adopt below and are not legal limitations on the right to recover.

We propose a standard similar to that adopted by the Restatement with regard to the intentional infliction of mental distress. See Restatement Second, Torts § 46 comment j at 77. Courts and juries which have applied the standard of conduct of "the reasonable man of ordinary prudence" are competent to apply a standard of *serious* mental distress based upon the reaction of "the reasonable man." *Cf.* Prosser, *Intentional Infliction of Mental Suffering: A New Tort,* 37 Mich. L. Rev. 874 (1939). We hold that serious mental distress may be found where a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.

Having established these standards, we do not find the considerations which favor limiting the defendant's liability to the exclusion of the plaintiff's claim of decisive weight. Furthermore, we are faced with a multiplication of psychic stimuli as "society becomes more complex and people are crowded together" and with increasing widespread knowledge of the debilitating effect mental distress may have on an individual's capacity to carry on the functions of life. The force which compels recognition of an element of damages, once parasitic, as an independent basis

of liability is social change. Street, I Foundations of Legal Liability, Torts 470 (1906); Harper and James, 2 Law of Torts 916 (1956). It can no longer be said that the advantages gained by the courts in administering claims of mental distress by reference to narrow categories outweigh the burden thereby imposed on the plaintiff. We recognize that the interest in freedom from negligent infliction of serious mental distress is entitled to independent legal protection. We hold, therefore, that there is a duty to refrain from the negligent infliction of serious mental distress.

After due regard to the standards we have adopted above, the question of whether the defendant is liable to the plaintiff in any particular case will be solved most justly by the application of general tort principles. *Battalla* v. *State*, 10 N.Y.2d 237, 176 N.E.2d 729 (1961); *Ferrara* v. *Galluchio*, 5 N.Y.2d 16, 176 N.Y.S.2d 996, 152 N.E.2d 249, 21 A.L.R.2d 331 (1958); *Colla* v. *Mandella*, 1 Wis. 2d 594, 85 N.W.2d 345, 64 A.L.R.2d 95 (1957); *Dillon* v. *Legg*, 69 Cal. Rptr. 72, 441 P.2d 912 (1968); Harper and James, 2 The Law of Torts at 1039 (1956). Thus a further limitation on the right of recovery, as in all negligence cases, is that the defendant's obligation to refrain from particular conduct is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous. *See* Harper and James, *supra* at 1018; Smith, *supra* at 244; Amdursky, *The Interest in Mental Tranquillity*, 13 Buffalo L. Rev. 339, 353 (1964). Therefore, on remand, the trial court must also decide whether, under the facts of this case, serious mental distress to the plaintiff was a reasonably foreseeable consequence of the defendant's act.

The trial court did not indicate what rule it applied in

awarding damages for mental distress. We remand, with instructions to apply the rule we have adopted.[8]

The trial court did not designate the sum awarded for each head of damages but awarded a lump sum for "mental anguish and suffering, inconvenience, disruption of home and family life, past and future, etc." The evidence did not warrant damages for "future" disruption of home and family life. Also, it was clear error to include "etc." in the award as a head of damages. The State contends that the failure to award separate verdicts as to damages on each of the heads of damages was error. The award of a lump sum for different claims is not reversible error. However, failure to state the amount awarded for each claim makes it impossible for the reviewing court, absent any other indication in the record, to amend the lump sum award when it is decided on appeal that error was committed concerning the consideration of a particular claim by the factfinder, the excessiveness or adequacy of an award, or the evidence necessary to sustain an award. See Mayne, Damages 534 (4th ed. 1884); Watson, Damages and Personal Injuries § 340 at 425 (1901); 4 Sedgewick, Damages § 1276 at 2612 (9th ed. 1912). The result is an unnecessary retrial of issues. While in this case we must remand with instructions to reduce the lump sum

---

[8] Against the holding it is said that juries are now "without restraint" and that the law should not encourage "attachment to material possession" "in an age when man has surrounded himself with a veritable plethora of material possessions." Indeed, our decision does shift a part of the burden of administering claims of mental distress inordinately assumed by the courts to juries. As in other mental tort cases, the jury, representing a cross section of the community is in a better position to consider under what particular circumstances society should or should not recognize recovery for mental distress. We have not decided that a value should be put on "attachment to material possessions" but that that decision is properly a function which should be shared with the jury. Moreover, the jury is no less "without restraint" under the "reasonable man" standard we have established than in innumerable other negligence cases where a "reasonable man" standard and general tort principles are applied and where the preliminary issue of whether the case presents questions on which reasonable men would disagree is for the court.

award accordingly, we hold that where claims are independent and there is a likelihood that collateral questions concerning the claims may be raised in the future, the trial judge on his own motion or on motion by counsel should direct that separate verdicts on damages be returned on each of the claims to aid the reviewing court in isolating error and to prevent unnecessary retrial of issues. *Nylander* v. *Rogers,* 41 N.J. 236, 196 A.2d 1 (1963) ; *cf.* McCormick, Damages § 16 at 67.

The judgment is affirmed except with respect to the award for interest charges and the award for "mental anguish and suffering, inconvenience, disruption of home and family life, past and future, etc."

Reversed in part and remanded for disposition consistent with this opinion.

*Ronald Y. Amemiya, William H. Yim* and *Walton D. Y. Hong,* Deputy Attorneys General (*Bertram T. Kanbara,* Attorney General, with them on the briefs) for the State of Hawaii, appellant.

*Frank D. Padgett* (*Padgett, Greeley, Marumoto & Akinaka* of counsel) for appellees.

## CONCURRING & DISSENTING OPINION OF LEVINSON, J., WITH WHOM ABE, J., JOINS.

I concur with parts I and II of the majority opinion. However, I must dissent from part III dealing with the interest on the loan taken by the plaintiff because of its ambiguity and part IV dealing with damages for emotional distress.

### A.

This court in part III holds that the prohibition against interest in HRS § 662-8 refers only to "compensation for the delay in payment of money damages which is measured from the accrual of the claim until final judgment, and does not include interest charges which, *as an actual ex-*

*pense,* constitute an item of such money damages." (Emphasis added.) The policies behind the majority's argument are persuasive in that the law should encourage the mitigation of damages and the plaintiffs in this case were forced by economic necessity to borrow money. Nevertheless, I would allow the plaintiffs the interest paid on the borrowed money from the time it was borrowed only until the date of the final judgment against the defendant and no longer. That interest constitutes the plaintiffs' only "actual" damages.

If, in addition to interest from the time the money was borrowed to the date of judgment, the majority would allow interest charged on the note for a period of time *after* the date of judgment, a fact which the majority does not clarify although the court below allowed interest for five years at an effective annual rate of 14.81%, I disagree. The judgment in this case was filed on July 29, 1968, less than a year after the money was borrowed. Any expenses incurred by the plaintiffs for the use of the borrowed money after the final judgment, whether they are due to a delay in the payment of the judgment or otherwise, are covered by HRS § 662-8 which provides that "interest shall be computed at the rate of four per cent a year from the date of judgment up to, but not exceeding, thirty days after any appropriation act providing for payment of the judgment." It may be true that the plaintiffs did not have the money to pay the note and stop the accrual of interest on the date of the judgment although it was their contractual right with the lender and their statutory right under HRS § 408-15(f) to do so. However, the statutory interest rate then begins to run on the amount of the judgment. To push the concept of "interest" as "damages" past the date of a judgment disregards the plain language of HRS § 662-8 which specifies a statutory interest rate thereafter.

## B.

With respect to part IV of the majority opinion it is my view that the reality of mental suffering because of the loss of or injury to property is offset by my disagreement with the policy of recognizing emotional ties to material objects and by the vast potential for abuse inherent in such a theory of recovery. The majority cites no cases granting recovery in this situation and to my knowledge there are none. While I am not reluctant to pioneer with new legal doctrines, I am not convinced that this case merits the breaking of new ground in the field of tort law.

I would begin by placing the concept of emotional distress in perspective. It is generally held that mental disturbance alone, without accompanying physical injury or physical consequences, is not enough for recovery. This is the position of the Restatement (Second) of Torts § 436A (1965). The reasons given are that emotional distress without physical injury is usually trivial and easy to feign, and that mere negligence on the part of the tortfeasor does not warrant such recovery. See Restatement (Second) of Torts § 436A Comment b at 461-62 (1965).

Dean Prosser writes that the only valid objection against the type of recovery the majority would permit is the danger of "vexatious suits and fictitious claims." Prosser, *Torts* § 55 at 347 (3d ed. 1964). Taking this objection first, the problem would be to set down standards which insure that only those claims which are based on satisfactory evidence are eligible for recovery. The majority fails to adopt a sufficiently stringent test to measure the "genuineness" and "seriousness" of mental distress in cases arising out of property damage in spite of the thoughtful criteria laid down by them. The "reasonable man" test is no limitation on a plaintiff's potential liability for mental suffering. In fact it only exacerbates the

problem as juries can now be called upon to give damages for mental distress in many tort cases without restraint. To be distinguished from the majority's standards are the presently accepted limits of requiring that physical injury accompany mental disturbance or that the mental disturbance be caused by peril or harm to another closely or intimately related to the person disturbed before compensation will be allowed.[1] 2 Harper & James, *The Law of Torts* § 18.4 (1956) ; Restatement (Second) of Torts § 436 (1965). These are situations not involved in the present case and on which I would reserve judgment.

It further appears to me that when a person's material possessions are threatened by the negligence of another, it cannot be said that the owner is within a foreseeable zone of "psychic" risk. Even though a person's injury may be very real and can be proven, I would question the policy behind recognizing the value of an attachment to material possessions. This attachment should neither be encouraged by society nor made a basis for recovery in a court of law in an age when man has surrounded himself with a veritable plethora of material possessions approaching the limits of what even an affluent society needs or can afford. One might ask what is to distinguish this case from the possibility of recovery in a situation where a prized and revered automobile which other persons might consider a jalopy is destroyed or, if in the present case, a family heirloom or photograph album were ruined by the flooded home. Would recovery be possible in either example? It would be under the majority's test if a "reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case."

---

[1] *See e.g.,* Dillon v. Legg, 68 Cal. 2d 728, 441 P.2d 912, 69 Cal. Rptr. 72 (1968).

It should be noted that the majority consists of only one regular member of this court with two circuit judges sitting as substitutes while the dissent is signed by two regular members of this court. In saying this I do not intend to belittle the wisdom of the two learned circuit judges but it is obvious that until the full court sits and rules on another case of this nature, the question of recovery for emotional distress resulting from the loss of or damage to property is still subject to great uncertainty.