**Electronically Filed
Supreme Court
SCAP-18-0000068
30-JUN-2020
10:12 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

LEONA KALIMA; DIANE BONER; RAYNETTE NALANI AH CHONG,
special administrator of the estate of JOSEPH CHING, deceased;
CAROLINE BRIGHT; DONNA KUEHU; IRENE CORDEIRO-VIERRA;
and JAMES AKIONA, on behalf of themselves and all others
similarly situated,
Plaintiffs-Appellees-Cross-Appellants,

vs.

STATE OF HAWAI'I; STATE OF HAWAI'I DEPARTMENT OF HAWAIIAN HOME
LANDS; STATE OF HAWAI'I HAWAIIAN HOME LANDS TRUST INDIVIDUAL CLAIMS
REVIEW PANEL; DAVID Y. IGE, in his official capacity
as Governor of the State of Hawai'i,
Defendants-Appellants-Cross-Appellees.

SCAP-18-0000068

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-18-0000068; CIV. NO. 99-4771-12)

JUNE 30, 2020

RECKTENWALD, C.J., NAKAYAMA, POLLACK, AND WILSON, JJ.,
AND CIRCUIT JUDGE VIOLA, IN PLACE OF McKENNA, J., RECUSED

OPINION OF THE COURT BY NAKAYAMA, J.

## I.  INTRODUCTION

In 1990, Senator Michael Crozier observed, "[b]oth the length of the list and the length of the wait make the vast majority of Native Hawaiian people despair of ever receiving an award of land."  Senator Michael Crozier, Testimony Before the Hawai'i Advisory Committee, United States Commission on Civil Rights (Aug. 2, 1990).  In the thirty years since Senator Crozier's statement, the State of Hawai'i has done little to address the ever-lengthening waitlist for lease awards of Hawaiian home lands.

In light of the Circuit Court of the First Circuit's (circuit court) 2009 ruling that the State breached its duties as trustee of the Hawaiian Home Lands Trust (the Trust), we are now tasked with reviewing the circuit court's decision granting and apportioning monetary damages to those Native Hawaiian beneficiaries who, as a result of the State's mismanagement of the Trust, have languished on the waitlist – some for decades.

Constrained by the provisions of Hawai'i Revised Statutes (HRS) Chapter 674 (Supp. 1991), entitled "Individual Claims Resolution Under the Hawaiian Home Lands Trust," the circuit court adopted a Fair Market Rental Value model (FMRV model) by which the circuit court can estimate the actual loss each individual beneficiary incurred.  The interests of justice

2

and the extent of the State's wrongful conduct support a liberal interpretation of HRS Chapter 674 and a generous construal of the circuit court's damages model. We hold that the FMRV model is an adequate method for approximating actual damages.

For the reasons discussed below, we affirm in part and vacate in part the circuit court's January 9, 2018 final judgment and remand for further proceedings consistent with this opinion.

## II.  BACKGROUND

Plaintiffs-Appellees Cross-Appellants Leona Kalima, Diane Boner, Raynette Nalani Ah Chong, special administrator of the Estate of Joseph Ching, deceased, Caroline Bright, Donna Kuehu, Irene Cordeiro-Vierra, and James Akiona, on behalf of themselves and all similarly situated (collectively "Plaintiffs") are a group of Native Hawaiian Trust beneficiaries who claim that they incurred damages while on the waitlist to receive homestead land as a result of breaches of trust duties by Defendants-Appellants Cross-Appellees the State of Hawai'i, the State of Hawai'i Department of Hawaiian Home Lands (DHHL), the State of Hawai'i Home Lands Trust Individual Claims Review Panel (the Panel), and Governor David Y. Ige (collectively "the State"). Both Plaintiffs and the State appealed the circuit court's January 9, 2018 final judgment.

3

## A. Trust History

In 1920, Congress enacted the Hawaiian Homes Commission Act (HHCA), which created a land trust intended to rehabilitate displaced Native Hawaiian people by enabling them to lease residential, agricultural, or pastoral homestead land from the Trust for one dollar per year. Kalima v. State (Kalima I), 111 Hawai'i 84, 87, 137 P.3d 990, 993 (2006); Hawaiian Homes Commission Act, ch. 42, sec. 207, 42 Stat. 108, 48-49 (1920). When the Territory of Hawai'i became a state in 1959, the State took over the management and disposition of the Trust. Kalima I, 111 Hawai'i at 87, 137 P.3d at 993. In the years that followed, the State struggled to carry out its duties and obligations as trustee. The State began efforts in 1983 to resolve issues relating to the HHCA and to the Trust. Id. at 87-88, 137 P.3d at 993-94.

In 1988, the Hawai'i State Legislature (the Legislature) passed "The Native Hawaiian Judicial Trusts Relief Act," which provided for limited waiver of the State's sovereign immunity to enable beneficiaries of the Trust to bring suits for past breaches of the Trust and prospective suits for damages related to breaches of the Trust after 1988. Id. at 88, 137 P.3d at 994; 1988 Haw. Sess. L. Act 395, § 3 at 945.

In 1991, the Legislature passed the "Individual Claims

Resolution Under the Hawaiian Home Lands Trust Act." 1991 Haw. Sess. L. Act 323, § 1 at 990 (Act 323). Act 323 was codified as HRS Chapter 674. HRS Chapter 674 established a process for resolving claims for damages by individual beneficiaries of the Trust caused by the State's breaches of the Trust which occurred between August 21, 1959, and June 30, 1988. HRS § 674-1 (1993). We described the process for resolving claims under HRS Chapter 674 as follows:

> Chapter 674 authorizes the Panel to review and evaluate the merits of claims brought by individual beneficiaries, render findings, and recommend monetary damages and other relief. HRS § 674-1. After reviewing an individual's claims, the Panel is then required to render an advisory opinion to the legislature regarding the merits of each claim, including an "estimate of the probable compensation or any recommended corrective action for legislative action[.]" HRS § 674-1(c).

Kalima I, 111 Hawai'i at 90, 137 P.3d at 996.

Part III of Chapter 674, entitled "Judicial Relief for Retroactive Claims by Individual Native Hawaiians," provides,

> [t]he State waives its immunity from liability for actual damages suffered by an individual beneficiary arising out of or resulting from a breach of trust or fiduciary duty, which occurred between August 21, 1959, to June 30, 1988, and was caused by an act or omission of an employee of the State in the management and disposition of trust resources.

HRS § 674-16 (1993) (emphasis added). Chapter 674 defines "actual damages" as

> direct, monetary out-of-pocket loss, excluding noneconomic damages as defined in section 663-8.5 and consequential damages, sustained by the claimant individually rather than the beneficiary class generally, arising out of or resulting from a breach of trust, which occurred between August 21, 1959, and June 30, 1988, and was caused by an act or omission by an employee of the State with respect to an individual

> beneficiary in the management and disposition of trust
> resources.

HRS § 674-2 (1993).

Meanwhile, the State was taking steps to better perform its duties as trustee by recovering alienated land and compensating the Trust for non-beneficiary use of that land. In 1994, with the passage of Act 352, the State transferred 16,518 acres of trust lands from the Department of Land and Natural Resources (DLNR) to DHHL and paid DHHL $12 million for uncompensated use of those lands.

## B. 1999 Litigation

On December 29, 1999, representative plaintiffs Leona Kalima, Diane Boner, and Joseph Ching filed a class action complaint against the State alleging breaches of the HHCA's trust obligations between 1959 and 1988 and claiming that the plaintiffs were entitled to damages under HRS Chapter 674.

On August 29, 2000, following Plaintiffs' motion for class certification as to Count I of the Plaintiffs' complaint, the circuit court[1] entered an order granting the motion and defining the class in Count I:

> All Hawaiian home land trust beneficiaries who timely filed a
> claim with the Hawaiian Home Lands Trust Individual Claims
> Review Panel, gave notice of intent to sue by October 1, 1999
> and filed suit by December 31, 1999, excluding any
> beneficiaries whose claims were either approved by the
> Legislature or settled.

---

[1]    The Honorable Victoria S. Marks presided.

The circuit court also granted Plaintiffs' motion for partial summary judgment as to Count 1.

The State brought an interlocutory appeal of the circuit court's order granting partial summary judgment before this court. Kalima I, 111 Hawai'i 84, 137 P.3d 990 (2006). In Kalima I, this court held that sovereign immunity did not bar Plaintiffs' right to sue under HRS Chapter 674. Id. at 112-13, 137 P.3d at 1018-19. This court affirmed in part and vacated in part the circuit court's 2001 judgment, and held:

> (1) [we] affirm the circuit court's determination that the plaintiffs are entitled to pursue their claims under HRS chapter 674; (2) [we] reverse the circuit court's determination that Act 14 is a settlement agreement and that the plaintiffs have a right to sue under HRS chapter 661; and (3) [we] remand this case to the circuit court for further proceedings consistent with this opinion.

Id.

In addition, this court held that Chapter 674 should be "liberally construed to suppress the perceived evil and advance the enacted remedy" and should not be narrowly interpreted to "impede rather than advance the remedies" provided by the statute. Id. at 100, 137 P.3d at 1006 (quoting Flores v. United Air Lines, Inc., 70 Haw. 1, 12, 757 P.2d 641, 647 (1988)).

## C. Post-Kalima I Litigation

The subject of this appeal is the litigation that followed this court's holding in Kalima I that Plaintiffs were

7

permitted to sue for damages under HRS Chapter 674.

## 1. Class Certification on Liability

Following Kalima I, Plaintiffs moved for certification of various subclasses on the issue of liability (Motion for Class Certification on Liability). The circuit court granted the Motion for Class Certification on Liability on June 6, 2007 and certified the following subclasses for purposes of liability – Subclass 1: Waiting List Subclass, Subclass 2: Ultra Vires Qualifications Subclass, Subclass 3: Uninhabitable Awards Subclass, Subclass 4: Lost Application Subclass[2], Subclass 6: Successor Rights Subclass. The circuit court defined the waitlist subclass as "[a]ll Chapter 674 plaintiffs who were on the [DHHL] waiting list for a homestead and who submitted a claim to [the Panel] because they were not awarded a homestead in a prompt and efficient manner." The waitlist subclass comprised 65.9% of the total class members.

## 2. Liability Trial

The circuit court conducted a five-week trial on liability[3] from August 4, 2009 to September 11, 2009, during which, as the circuit court stated in its ensuing liability

_____

[2]     The circuit court did not certify a "Subclass 5."

[3]     On October 2, 2007, the circuit court granted in part and denied in part Plaintiffs' Motion to Bifurcate and ordered that it would try the waitlist subclass's liability case only.

order, "the parties litigated whether any of the trust breaches found by the court were a legal cause (a substantial factor) in waitlist applicants experiencing compensable harm (out-of-pocket expenses) through the failure or inordinate delay in receiving homestead awards of any kind."

At the liability trial, former DHHL deputy director Benjamin Henderson (Henderson) testified about the process for awarding homesteads. Henderson testified that in order to qualify to apply for a homestead, a person must show only that the person is over 18 years of age and meets the Native Hawaiian Qualification, i.e., that he or she is at least fifty percent Native Hawaiian. According to Henderson, a person need not show any financial information to qualify to apply for a homestead.

Henderson stated that when homestead lands are developed, DHHL sends an "orientation notice" to many applicants on the waitlist. Henderson testified that the orientation notice invites recipients to an orientation meeting and may indicate that at some point the applicant might need to meet other requirements to receive a homestead. If the applicant does not respond or responds indicating that the applicant is not interested, the applicant is "deferred" from receiving a homestead in that round of offerings, but does not lose their place on the waitlist.

9

At the orientation meeting, the applicant is given more information about the particular homesteads available and may be informed that the applicant will need to financially qualify to be "invited to participate in the offering," i.e., to lease the homestead. Often, lenders attend orientation meetings to enable applicants to determine if they will be able to meet the financial qualification requirements.

If an applicant expresses interest in obtaining a homestead, attends the orientation meeting, and is able to show that they meet the financial qualification requirements, the applicant will be "invited to participate in the offering," select an available lot, and begin to lease it.

Henderson also gave a deposition, the following testimony from which was read into the record at trial on August 14, 2009:

> Question:
>
> . . . .
>
> What is DHHL's position on [what constitutes placement on the land in a prompt and efficient manner, specifically, the number of years between an application and an award]?
>
> Answer: DHHL's position is that certainly, again, assuming you had the resources available to them, the normal development process is probably five to six years. I mean, that's not, you know – I mean, yeah, you talk to any developer in the private market, in the private sector, they would probably tell you the same thing.
> I mean, planning, permitting, engineering plans, offsite, onsite construction, et cetera, home reconstruction, we are looking at a period of five to six years.

### 3. Liability Order

On November 3, 2009, the circuit court issued a decision regarding liability and causation (Liability Order). In the Liability Order, the circuit court found that the State breached the following four duties as trustee during the claims period: (1) the duty to keep and render accounts; (2) the duty to exercise reasonable care and skill; (3) the duty to administer the trust; and (4) the duty to make the trust property productive. The circuit court specifically found that the State breached the Trust as follows:

> Defendant State's failure for 25 years (1959-1984) to correct its own and the predecessor trustees' illegal "set asides" by cancellation or withdrawal of those executive orders or proclamations together with Defendant State's failure throughout the claims period to restore lands to the trust and to compensate the trust for fair rent during the period of non-beneficiary State use of trust lands were breaches of trust and trust duties as set forth in Sections 170, 174, 175, 176, 177, 179, 181, 223 [of the Restatement (Second) of Trusts].

The circuit court also found that "[t]he State's witness Mr. Ben Henderson, former deputy of DHHL, credibly testified that the normal site development time is 5 to 6 years and that would be the logical, optimal waiting list time for eligible applicants."

The circuit court concluded:

> Plaintiffs have proven by clear and convincing evidence breaches of trust by Defendants State and DHHL during the claims period and that the individual and/or cumulative effects of such breaches caused by acts or omissions by employees of the State in the management and disposition of trust resources were a legal cause of harm to the Plaintiffs herein which are compensable as defined by Sections 674-1, -17 of Hawaii Revised Statutes, thus necessitating further

11

> proceedings to determine the amount of damages, if any, each subclass member proves s/he sustained as a result of the breaches during the claim period.

In other words, the Liability Order determined liability, causation, and the fact of damages, but specifically identified the need for further proceedings to determine the amount of damages.

### 4. Motions on Methods for Calculating Damages

In March 2011, the parties filed simultaneous motions proposing distinct methods for calculating damages.

The circuit court[4] rejected both models and ordered Plaintiffs and the State to submit new damages model proposals.

The parties filed new motions on July 22, 2011. The Plaintiffs proposed calculating the FMRV of an improved residential homestead, adjusted for inflation. This proposal conformed each class member's loss to the lost value of a developed residential lot. As a secondary option, Plaintiffs proposed that claimants whose individual damages extended beyond the base amount could show out-of-pocket expenses (the cost of replacement leases obtained in the area in which they resided).

The State proposed a four-step model which was substantially the same as the model the circuit court had previously rejected.

---

[4] The Honorable Virginia L. Crandall presided over all damages model litigation from this point forward.

12

### 5. January 24, 2012 Order Re Parties' Damages Models

On January 24, 2012, the circuit court entered an order granting in part and denying in part Plaintiffs' and the State's motions to adopt damages calculation models (Order Re Parties' Damages Models). Based upon the November 3, 2009 Liability Order's finding that "normal site development time is 5 to 6 years," the circuit court found that damages did not begin to accrue until six years after a plaintiff was placed on the waitlist.

The circuit court also ordered the parties to present new motions on the "individualized circumstances" that the parties wished to raise, which could be determined on a class-wide basis. These "individualized circumstances" included "a subclass member's deferring or rejecting lease offerings or opportunities, a subclass member's financial ability or qualifications, date of application, or DHHL policies and rules including any applicable priorities."

Finally, the circuit court ordered that "after resolution of the [individualized circumstances] motions . . . the Court will determine the model to be used to calculate damages and whether referral to a Special Master to make such calculations is appropriate."

On February 10, 2012, Plaintiffs filed a Motion for

13

Partial Summary Judgment arguing that "'deferred status' imposed by DHHL is not a bar to damages in this case, or alternatively that DHHL must prove it strictly followed its regulations before it can invoke 'deferred status' as a defense to damages."

That same day, the State filed two motions "for adoption of specific rules to govern computation of damages." The State proposed twenty-four "rules"[5] which limited or barred certain claimants' damages.

The circuit court resolved those motions, in pertinent part, as follows.

### 6. February 4, 2013 Order Re Financial Qualification Requirements

On February 4, 2013, the circuit court denied Plaintiffs' 2012 Motion for Partial Summary Judgment on Financial Qualification Requirements Imposed on Beneficiaries Seeking Homestead Awards (Order Re Financial Qualification Requirements) and ordered that if a claimant was deferred due to financial disqualification, the State could present evidence of that deferral to limit the claimant's damages period.

In the same order, the circuit court ruled:

> Defendant's motion to adopt proposal number 4, "A claimant is barred from obtaining any damages for any period of time during which he or she would have turned down a homestead offer for any reason at all," is GRANTED IN PART AND DENIED IN PART, AS FOLLOWS: If an offering of a homestead

---

[5] The circuit court later referred to the State's proposed rules as both "rules" and "proposals."

> lease was made to a member of the Waiting List Damages
> Subclass and the member declined that offering, then the
> member is barred from recovering damages from that time
> forward.

The circuit court also ordered that "Waiting List Damages Subclass members bear the burden of proving the amount of their damages, utilizing the damages model ultimately adopted for the Waiting List Damages Subclass by the Court."

### 7. February 14, 2013 Order Re FMRV Damages Model

On February 14, 2013, the circuit court entered an Order Granting in Part Plaintiffs' Second Motion to Determine What Model Should Be Used to Establish the Amount of Damage Class Members Suffered as a Result of the Breaches Committed by Defendants (Order Re FMRV Damages Model). The Order Re FMRV Damages Model detailed, in four parts, the FMRV-based damages model that would be used to calculate damages.

The circuit court ordered that (1) the model should measure annual FMRV for comparable land; (2) damages would begin to accrue six years after the date the claimant's application was accepted by DHHL and end on the date of award or date of trial, whichever is earliest; (3) damages would be discounted by the one dollar annual rental payment; and (4) class members were provided with an alternative option "to prove his/her actual direct monetary out of pocket expenses exceeded fair market rental value," in lieu of accepting damages produced by the

15

following formula:

a.  Based upon available data sources and other evidence, including, but not limited to (a) evidence of actual sales of homesteads; (b) evidence of valuation of homestead lots determined by the Department of Hawaiian Home Lands, if any; (c) sales data of comparable fee lots (residential, agricultural, and pastoral)[;] and (d) actual rental values of comparable lots, which could be used to determine the fair market rental value of the three types of DHHL leasehold lots, a model or models will be developed to help determine damages based upon fair market rental value of such lots from 1960 to the present (the "Damages Period").  The Court, however, need not consider each factor listed above if it finds them to be irrelevant or unnecessary.

b.  Fair market rental values will be calculated on a class-wide basis using the following procedure:

i.  First, calculate the market value of comparable lots (residential, agricultural and pastoral), exclusive of residences or other structures, in specified locations as of 1960 based upon the above available data sources and evidence, and based upon that evidence, <u>estimate fee simple values for each type of homestead lot</u>.

ii[.]    Second, based upon relevant real estate data, <u>compute the estimated fee simple value of the lots for each year of the Damages Period</u>, including, without limitation, referring to empirical data (including market sales) at various points in time, including regression analysis to fill in missing data points.

iii.    Third, <u>calculate annual fair market rental values from the fee simple values</u> based upon a methodology the Court determines is most accurate, after reviewing the evidence and the testimony or declarations of the parties' experts.

OR

in lieu of first calculating fee simple values and converting them as prescribed in paragraphs (i)-(iii), calculate the annual fair market <u>rental</u> values for each year <u>directly</u> from rental values of comparable lots, and other relevant evidence, including regression analysis to fill in missing data points.

iv. Fourth, subject to applicable defenses, <u>compute the potential loss to each claimant based upon the time period</u> running from six years after a beneficiary's application was accepted by DHHL until a homestead award was made, or date of trial. Specifically: (1) the annual fair market rental value for each year would be computed, beginning six years from the date the application was received; (2) then $1 for each year of homestead rent a homesteader would have paid would be subtracted; and (3) <u>the losses for each year then would be summed.</u>

Any applicable defenses may limit the years to be summed.

c. For O'ahu residential lease applicants, fair market rental values will be calculated on a class-wide basis using the following procedure:

i. Fee simple values, or annual fair market rental values (depending upon methodology chosen), for sales or leases of a 5,000 square foot lot (or other appropriate size) in Maili (or other appropriate homestead area), will be used to establish the annual fair market rental value of an improved residential homestead lot on O'ahu during each year of the Damages Period . . . .

d. A plaintiff may choose to prove his/her actual direct monetary out of pocket expenses exceeded fair market rental value, and may submit additional individual proof of actual direct monetary out of pocket expenses for the period of loss, and add that additional increment to fair market rental value (minus $1), subject to Defendants establishing defenses or mitigation.

(Some emphases added; some formatting altered.)

In the Order Re FMRV Damages Model, the circuit court also granted or denied several of the rules that the State proposed in its "individualized circumstances" motions.

First, the circuit court ruled,

Defendants' proposed rule 5: "A claimant is barred from obtaining any damages for any period of time during which he or she did not spend any money directly out of pocket on alternative land," is GRANTED. HRS §§ 674-2 & -16 require proof of direct monetary out of pocket loss by Plaintiffs.

Second, the circuit court ruled,

 Defendants' proposed rule 6: "A claimant is barred from

17

> obtaining any damages for any portion of out of pocket rental or other payments attributable to houses or other structures on alternative land. Damages must be restricted to only the portion of out of pocket rental payments attributable to the land alone," is GRANTED, based on the court's understanding that Plaintiffs' model is based on rental value of the land only, exclusive of value or expenses incurred for residences or other structures.

> Third, the circuit court ruled,

> Defendants' proposed rule 7: "A claimant buying rather than renting alternative land, shall not be awarded damages for her mortgage payments (or down or cash payments), but only what it would cost to rent that land. In addition, any increase in the value of the purchased land must be subtracted from a claimant's damages," is DENIED, WITHOUT PREJUDICE, and may be raised on an individual basis by Defendants as a defense or as failure to mitigate damages for plaintiffs who seek to recover damages in excess of the fair market <u>rental</u> value. In addition, Defendants may seek to prove as an offset to damages any increase in value of <u>purchased</u> (as opposed to rented) alternative land.

(Emphases in original.)

> Finally, the circuit court ruled,

> Defendants' proposed rule 8: "If a claimant rents or purchases alternative land of a higher quality or value as compared with the quality or value of typical or average homestead land, her damages must be limited to the rental payments on typical or average homestead land," is DENIED, WITHOUT PREJUDICE, and may be raised on an individual basis by Defendants as a defense or as a failure to mitigate damages for plaintiffs who seek to recover an increment of damages in excess of the fair market value of a typical or average homestead lot.

In sum, the circuit court largely adopted Plaintiffs' proposed FMRV model, but included certain qualifications proposed by the State which were designed to limit damages to actual damages.

### 8. Trial on Methodological Issues Regarding FMRV Model

Between October 1, 2013, and October 3, 2013, a three-day trial took place on methodological issues to determine how

to calculate the FMRV.  Essentially, the circuit court sought a statistical model that would derive the rental value of the Maʻili lot from the fee simple value of the lot over time.

Plaintiffs' expert Andrew Rothstein (Rothstein) and the State's expert James Hallstrom, Jr. (Hallstrom) testified that different methodologies could be used to derive the rental values of a given lot.  Based on the circuit court's February 14, 2013 Order Re FMRV Damages Model, which stated,

> [f]ee simple values, or annual fair market rental values (depending upon methodology chosen), for sales or leases of a 5,000 square foot lot (or other appropriate size) in Maili (or other appropriate homestead area), will be used to establish the annual fair market rental value of an improved residential homestead lot on Oʻahu during each year of the Damages Period[,]

the experts demonstrated how their proposed methodologies derived rental values from the 5,000-square-foot Maʻili lot.

The experts proposed three methodologies that could be used to calculate annual fair market rental values: (1) the market value curve; (2) the compound curve; and (3) the best fit curve.[6]  At trial, Hallstrom described the best fit curve as follows:

> The best fit curve is a mathematical equation we used in Excel, a computer program, in which we entered all of the 122 sales.  We entered the dates in which they occurred.  And we determined the exponential curve that best fit all of the data.
> [T]here's a – there's a test or an indication called a

---

[6]    These methodologies are referred to interchangeably in the record as "curves" and "models."  The selected curve or model provides the basis for calculating fair market rental value and is only one part of the circuit court's overall damages model.

> coefficient, a confidence coefficient, and it tells you how accurate that is. And in this case, it was .8, meaning that it has a reasonably high level of confidence and pretty well explains the variance throughout the period and is – we would consider it very reliable if you were looking for the point of central tendency trend through the study period.
>
> . . . .
>
> As there are changes in the market, the best fit curve – once you have all of the transactions plotted, the best fit curve basically goes between all of those data points to best explain them. It doesn't necessarily start off at the very first point, and it doesn't necessarily end at the very last point, but it best explains what's happening during the period.

Hallstrom opined that the market value model is the most accurate model, followed by the best fit model. Hallstrom stated, however, that a disadvantage of the market value model is that it creates the potential for wide disparity in individual damages based on market fluctuation. Hallstrom testified that, unlike the market value model,

> [the best fit model] gives you the overall central tendency of exactly where the market is, but without the spikes in the market that are the natural phenomena of the real estate market. So at least it measures the growth and gives you a consistent application of what actually happened when you look at all of the transactions.

### 9. Adoption of the Best Fit Curve

On October 7, 2014, the circuit court issued a Trial Order (October 7, 2014 Trial Order) in which, in its discretion as finder of fact, it adopted the best fit model.

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that for purposes of calculating damages for claimants who applied for Oahu residential leases under the February 14, 2013, Order, the "Best Fit" model as set forth in Exhibit D-40 shall be used to determine the fee simple values to calculate annual fair market rental values. This model comprises (i) annual rental values based on four percent (4%) of the fee simple value of

> the land area of a 5,000 square foot lot in Maili for any given year; (ii) rents adjusted annually; and (iii) a "best fit" model derived from actual fee simple Maili valuations from 1959 through July 8, 2013 (as shown on Exhibit D-2); (iv) with no increases for the consumer price index ("CPI") or present value adjustments.

Also in the October 7, 2014 Trial Order, the circuit court ruled that the damages model does not provide for "increases for the consumer price index ("CPI") or present value adjustments."

At a September 18, 2015 hearing, the circuit court orally ruled that the Oʻahu residential best fit model would be applied to the residential homesteads across the entire state. The circuit court entered an order pursuant thereto on September 22, 2016, which stated, "the Best Fit model adopted in this Court's October 7, 2014 Trial Order [] shall be used to calculate annual fair market rental values used to calculate damages for all claimants who applied for residential leases on Hawaiʻi, Kauaʻi, Lanaʻi, Maui, and Molokaʻi."

In other words, the circuit court ruled that the best fit model, which is based on a 5,000-square-foot lot in Maʻili[7] on Oʻahu, would be used as the basis for residential homestead claimants' damages statewide.

---

[7]    Plaintiffs assert that "the 5,000 square foot lot in Maʻili was selected because it was the most conservative value of an Oahu residential lot[.] [C]ompared . . . to other locations like Waimanalo and Papakolea this was the most conservative value to determine what the fair market value will ultimately be."

### 10. Order Re Damages Computation

On July 26, 2017, the circuit court issued an Order Granting in Part and Denying in Part Plaintiffs' Motion for Summary Judgment to Compute the Amount of Damage for Waiting List Subclass O'ahu Residential Group A (Order Re Damages Computation). In that order, the circuit court found that a subclass member's duty to mitigate damages did not arise until 1995, the deadline for a beneficiary to file a claim with the Panel under HRS § 674-7. The circuit court also found that damages are suspended from the date that the applicant was "deferred" from the homestead offering to the date of the first lease awarded for the offering from which the applicant was deferred. However, subclass members may "prove by rebuttal evidence that mitigation was excused because the claimants self-selected out for financial reasons or did not participate for other reasons that would excuse their duty to mitigate." Put differently, the circuit court ruled that if a claimant was forced to self-select out of the offering because the claimant was not financially qualified to accept an offering, the claimant's failure to mitigate was excused.

### 11. Order Re Native Hawaiian Blood Quantum

On June 19, 2017, the circuit court issued an Order Granting in Part and Denying in Part the State's Cross-Motion to

Establish Procedures and Legal Evidence for Confirming Native Hawaiian Blood Quantum for Waiting List Damages Subclass Members (Order Re Native Hawaiian Blood Quantum).  The circuit court ordered, "[t]o receive an award for damages, Waiting List Damages Subclass members must meet the [Native Hawaiian Qualification[8]] requirement and must demonstrate through evidence in this case that they applied for a homestead lease and were on the waiting list."

### 12.  Order Re Claims Administration Process

On July 26, 2017, the circuit court issued an Order Granting Plaintiffs' Motion to Establish Claims Administration Process to Resolve All Claims (Order Re Claims Administration Process).  The Order Re Claims Administration Process established a claims administration process to calculate specific damages awards and ordered that a Special Master supervise the claims administrative process.  The circuit court explained,

> [t]he Special Master shall supervise the Claims Administration Process and have authority to appoint a Claims Administrator to perform the ministerial work of processing all Waiting List Damages Subclass members' damages claims. The Special Master shall resolve any disputed legal or factual issues, which then may be appealed to the Court.

The circuit court ordered that the Special Master's duties would

---

[8]    The Native Hawaiian Qualification provides that an applicant is "native Hawaiian" if the applicant is "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778."

include, among other things,

> 2.    Receiv[ing] all proofs of claim from members of the Waiting List Damages Subclass;
> 3.    Determin[ing] whether claimants meet the criteria to qualify as a member of the Waiting List Damages Subclass;
> 4.    Rul[ing] on discovery requests and disputes between the parties;
> 5.    Conduct[ing] evidentiary hearings on claims, if necessary; [and]
> 6.    Calculat[ing] damages, if any, for any individual member of the [subclass] according to the rules, valuation methods and applying any defenses established by the Court.

The circuit court ordered that each Waitlist Subclass member must submit a "Claim Form" demonstrating their prima facie right to damages.  The Claim Form requires disclosure of the date each claimant submitted a homestead application, evidence of each claimant's Native Hawaiian Qualification, confirmation of prior homestead awards, the time period during which each claimant paid to rent alternative land, and each claimant's marital status.

The circuit court ruled that after each claimant submitted their Claim Form, the State was required to disclose its affirmative defenses, if any, and identify and produce all evidence in support of its defenses to each claimant's prima facie case.

## 13. HRCP Rule 54(b) Final Judgment

On January 9, 2018, the circuit court entered an HRCP Rule 54(b) final judgment as to the waitlist subclass's claims.

24

The circuit court ordered:

> 1. All claims of the Waiting List Subclass have been decided by the Court in favor of the Waiting List Subclass Plaintiffs . . . ; and
> 2. All claims in the Supplemental Complaint For Waiting List Damages [Filed December 19, 2013] regarding the amount of damages, if any, each Waiting List Subclass plaintiff representative or member is entitled to recover under the orders establishing the model, rules, and claims administration process previously entered for that purpose, have been decided by the Court.
>     In accordance with HRCP Rules 54(b) and 58, the Court EXPRESSLY FINDS that there is no just reason for delay and EXPRESSLY DIRECTS entry of judgment in favor of the Waiting List Damages Subclass.  All claims of the Waiting List Damages Subclass have been resolved and only ministerial functions are necessary to administer those claims.

## D.  ICA Proceedings and Subsequent Transfer

The State filed a notice of appeal on February 6, 2018.  Plaintiffs filed a notice of cross-appeal on February 19, 2018.  Plaintiffs filed an application for transfer to this court on December 31, 2018, to which the State filed a response of no opposition.  This court granted Plaintiffs' application for transfer on February 5, 2019.

## IV.  DISCUSSION

In resolving this case, we bear foremost in mind our admonition in Kalima I that HRS Chapter 674, a remedial statute, should be "liberally construed to suppress the perceived evil and advance the enacted remedy" and should not be narrowly interpreted to "impede rather than advance the remedies" provided by the statute.  111 Hawaiʻi at 100, 137 P.3d at 1006 (quoting Flores, 70 Haw. at 12, 757 P.2d at 647).  That is to

25

say – it is in the interests of justice to construe HRS Chapter 674 in a manner that permits the advancement of this case to the final stages of its resolution and to thereby afford a fair remedy to the beneficiaries who have for decades been deprived of the opportunity to lease their native land from the State.

**A.  The circuit court did not err by adopting the FMRV model.**

The central issue in this case is whether the circuit court's FMRV damages model calculates individual damages in a method permitted by HRS Chapter 674.  Plaintiffs, who proposed a similar FMRV model in their initial damages model proposal, assert that the FMRV model does not contravene Chapter 674 because, they argue, "out-of-pocket loss," as contemplated by HRS § 674-2, means the value of the lost benefit, i.e., the value of a homestead.  The State maintains that the FMRV model contravenes Chapter 674's "actual damages" requirement, which, the State argues, limits damages to the amount that subclass members actually spent to rent alternative land during the breach-caused delay period.

Courts often face challenges when attempting to calculate damages in complicated class action cases.  This difficulty should not, however, bar recovery for those entitled to damages, particularly when the difficulty of calculating damages is compounded by the failures of the wrongdoer.

26

This principle is widely reflected in the common law. The United States Supreme Court explained that "[w]here the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts." Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931). The Court resolved this predicament by holding that, when damages cannot be measured with exactness due to the nature of the wrongdoer's tort, damages may be approximated through "just and reasonable inference[.]" Id.; see also Anderson v. Mt. Clemens Potter Co., 328 U.S. 680, 687 (1946) (where employees could not establish the time spent doing uncompensated work due to violations by employers with respect to keeping proper records, the "remedial nature of [the Fair Labor Standards Act] and the great public policy which it embodies . . . militate against making" the burden of proving uncompensated work "an impossible hurdle for the employee.").

This court has long-echoed this concept. In Coney v. Lihue Plantation Co., 39 Haw. 129, 136 (Haw. Terr. 1951), this court explained,

> [t]he damages to be awarded should be such as adequately to compensate the actual loss or injury sustained. This is an obvious principle of justice from which we see no reason to

27

depart.  But in the application of the principle, difficulties often arise in ascertaining, with anything like accuracy, the actual damages which the plaintiff has suffered from the injury; or what sum will produce adequate compensation.

We concluded that "[t]he law never insists upon a higher degree of certainty as to the amount of damages than the nature of the case admits, and [] where, as here, the fact of damages is established, a more liberal rule is allowed in determining the amount."  Id. at 139.  This is true "particularly where the uncertainty was caused by the defendant's own wrongful acts."  Exotics Hawai'i-Kona, Inc. v. E.I. Du Pont De Nemours & Co., 116 Hawai'i 277, 292, 172 P.3d 1021, 1036 (2007) (emphasis added).

We apply the foregoing principle here.  It is undisputed that the State breached its duties to keep and render accounts, to exercise reasonable care and skill, to administer the trust, and to make the trust property productive, to the significant detriment of the Native Hawaiian people for whom the Trust was created.  The State's decision to continue to litigate this case for decades has compounded the challenges resultant from its own failure to keep adequate records – many of the beneficiaries have been unable to keep their own records over the years, particularly with respect to the amount that they paid to rent alternative land.

This court has not previously reviewed a trial court's

adoption of a damages calculation methodology. Both parties acknowledge, and we agree, that the question of which methodology best calculates damages is either a question of fact or a mixed question of fact and law. In either case, the circuit court's adoption of the FMRV model is reviewed under the "clearly erroneous" standard. See Bremer v. Weeks, 104 Hawai'i 43, 51, 85 P.3d 150, 158 and Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 119, 839 P.2d 10, 29 (1992). A finding of fact or a finding of fact that presents mixed questions of fact and law is clearly erroneous when, "despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." 104 Hawai'i at 51, 85 P.3d at 158.

The Fair Market Rental Value model does not provide a perfectly accurate measure of actual damages. However, the State has failed to supply a more accurate model. Moreover, the State's own wrongful acts, most notably the State's failure to keep adequate records, have brought about the uncertainty of the actual damages caused by its breaches. Here, the circuit court, in its discretion as factfinder, crafted a damages model which measures actual damages as accurately as is practicable. We hold that the circuit court did not clearly err in creating the FMRV model as the controlling method for calculating damages.

We affirm in part the circuit court's Order Re FMRV Damages Model and hold that the FMRV Model is an adequate method for estimating actual damages under HRS Chapter 674.

HRS Chapter 674 clearly limits recovery to actual damages. The express purpose of HRS Chapter 674 is to "provid[e] an individual beneficiary claimant the right to bring an action to recover actual damages for a breach of trust[.]" HRS § 674-1(2). HRS § 674-2 defines actual damages as

> direct, monetary out-of-pocket loss, excluding noneconomic damages as defined in section 663-8.5 and consequential damages, sustained by the claimant individually rather than the beneficiary class generally, arising out of or resulting from a breach of trust, which occurred between August 21, 1959, and June 30, 1988, and was caused by an act or omission by an employee of the State with respect to an individual beneficiary in the management and disposition of trust resources.

HRS § 674-16(a) states that "[t]he State waives its immunity from liability for actual damages[.]" HRS § 674-16(a).

Here, we must reconcile HRS Chapter 674 with the general rules of class action damages. The United States Supreme Court has held that, for purposes of Federal Rules of Civil Procedure (FRCP) Rule 23(b)(3),[9] the common question

---

[9]    FRCP Rule 23(b) provides,

(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

. . . .

(3) the court finds that the questions of law or fact common to class members predominate over any questions
(continued. . .)

requirement, class action damages must be capable of being measured across the entire class or subclass. Comcast v. Behrend, 569 U.S. 27, 35 (2013). If no common method can be established for determining damages, damages assessments may impermissibly predominate over questions common to the class. See Id. FRCP 23(b)(3)'s analogue in the Hawai'i Rules of Civil Procedure (HRCP) is HRCP Rule 23(b)(3).[10] Implicit in the Hawai'i

---

affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
    (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
    (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
    (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
    (D) the likely difficulties in managing a class action.

[10]   HRCP Rule 23(b) provides,

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the

(continued. . .)

31

statute, therefore, is the same requirement that class action damages must be capable of measurement across the entire class. See Comcast, 569 U.S. at 35.

The class action damages requirement appears to be at odds with the definition of actual damages set forth in HRS § 674-2. However, as it would be unjust to decline to apportion damages to injured parties because the wrongdoer's tortious action renders actual damages difficult to measure, a model must be created to reconcile the actual damages definition with the class action damages requirement. See Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1046 (2016) ("In a case where representative evidence is relevant in proving a plaintiff's individual claim, that evidence cannot be deemed improper merely because the claim is brought on behalf of a class."). Put differently, the appropriate damages model must be designed to calculate actual damages, as required by HRS Chapter 674, and must enable damages calculation class-wide, as required by HRCP Rule 23(b).

This model need not be exact. "The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case,

claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

which he alone is responsible for making, were otherwise . . .
the risk of the uncertainty should be thrown upon the wrongdoer
instead of upon the injured party." Story Parchment Co., 282
U.S. at 563. Indeed, "[t]he law never insists upon a higher
degree of certainty as to the amount of damages than the nature
of the case admits, and where, as here, the fact of damages is
established, a more liberal rule is allowed in determining the
amount." Coney, 39 Haw. at 139-40.

The circuit court's FMRV model envisions calculating
the fair market rental value on a class-wide basis using a four-
part procedure. First, the court will calculate the market
value of comparable residential, agricultural, and pastoral lots
and estimate fee simple values for each type of lot. Second,
the court will compute the estimated fee simple value of each
type of lot for each year of the damages period. Third, the
court will either calculate annual fair market rental values
from the best fit curve or calculate annual fair market rental
values for each year directly from the rental values of
comparable lots. Fourth, the court will sum the potential loss
to each claimant for the time period beginning six years after
the claimant's application was accepted by DHHL[11] until either a

---

[11] We vacate the circuit court's Order Re FMRV Damages Model to the extent that the FMRV model adopts the "six-year rule." See infra at section III(C).

homestead award is made or until the date of trial. Each claimant's FMRV damages calculation will be subject to applicable defenses by the State.

While the FMRV model may not measure actual damages with exactitude, exactitude is not required under the circumstances. The circuit court as factfinder found that the FMRV model was a reasonable method to determine actual damages as defined under HRS § 674-2, and we find no basis to interfere with that determination. We therefore find no error with the general method adopted by the circuit court. As discussed infra, we hold that the circuit court erred with respect to specific findings within the Order Re FMRV Damages Model. We therefore affirm in part the circuit court's Order Re FMRV Damages Model.

1. **The circuit court did not err in adopting the best fit curve.**

The circuit court did not abuse its discretion when it determined that the best fit curve represents the best way to calculate the FMRV of the Ma'ili lot.

Plaintiffs argue that the circuit court improperly adopted the State's expert's best fit damages model because the model arbitrarily reduces damages for the waitlist subclass. Plaintiffs allege that both sides' experts initially agreed that the market value model will most accurately measure damages.

34

According to Plaintiffs, the best fit model proposed by the State and adopted by the circuit court "is a device used to eliminate variations in data; it is not an actual measure of data." The best fit model, Plaintiffs assert, reduces damages for individual class members and aggregate damages for the subclass as a whole.

At the 2013 bench trial on damages, Plaintiffs' expert Rothstein and the State's expert Hallstrom stated that different methodologies can be used to derive the Ma'ili lot FMRV. The experts proposed three different methodologies: the market value curve, the compound curve, and the best fit curve. Both experts testified at length about the strengths and limitations of each methodology. After the trial, the circuit court, in its discretion as finder of fact, adopted the best fit curve.

The issue of which curve best derives the Ma'ili lot FMRV falls within the question of which methodology best calculates overall damages. Therefore, we review the circuit court's determination that the best fit model will be used to calculate damages under the "clearly erroneous" standard. See supra p. 29 (citing Bremer, 104 Hawai'i at 51, 85 P.3d at 158; Amfac, 74 Haw. at 119, 839 P.2d at 29).

The circuit court's determination that the best fit curve will be used to calculate damages was not clearly

35

erroneous.  According to both parties' expert testimony, the market value model is the most accurate model.  However, the circuit court did not err in selecting the best fit model because the experts also agreed that there are disadvantages to using the market value model.  The testimony of both experts indicated that the market value model creates the potential for wide disparity in individual damages awards based on appreciating land values and housing market fluctuations.  As such, it appears that the best fit model is the second most accurate of the three models, but that it also best provides for the calculation of class-wide damages.

In light of the evidence presented by both parties' experts on the various potential damages curves, the circuit court did not clearly err in selecting the best fit curve, which appears to be less exact but more fair than Plaintiffs' proposed market value model.

## 2. The circuit court correctly applied the Oʻahu FMRV model for residential leases to the entire state.

The circuit court did not err in applying a statewide measure of residential damages based on a homestead lot in Maʻili on the island of Oʻahu.

The State argues that the Maʻili lot is not a fair lot on which to base class-wide damages because Oʻahu land values are

36

higher than those of neighbor islands.

Plaintiffs contend that "[t]he court properly recognized that a statewide damages class requires a statewide measure of damages" and that, in any case, the State provides no evidence that O'ahu land values are higher than neighbor island land values.

Class action damages must be measurable across the entire class or subclass.  See supra pp. 31-32.  If no common method can be established for determining damages, damages assessments may impermissibly predominate over questions common to the class.  See Comcast, 569 U.S. at 35.

In order to establish a common method for determining damages here, the circuit court selected a 5,000-square-foot lot in Ma'ili as the basis for determining the rental value, of which claimants were deprived, for each year during the claims period.

The record reflects that the circuit court chose the 5,000-square-foot Ma'ili lot because Plaintiffs' expert Rothstein selected that lot as a conservative example of an O'ahu residential homestead for purposes of calculating O'ahu residential homestead applicant damages using the methods proposed by the Plaintiffs in their first and second proposed damages models.  Rothstein referenced the 5,000-square-foot Ma'ili lot in his Declaration attached to Plaintiffs' first

motion proposing a damages model.  Rothstein again referenced the Ma'ili lot in his Declaration attached to Plaintiffs' second motion proposing a damages model, stating,

> [f]or the purpose of this valuation, I have assumed a 5,000 square foot lot in Maili.  I have used this assumption based upon the most conservative estimates, i.e., the smallest lot size noted by Judge Hifo in her opinion and in the area where the market values are lowest.  These data are additionally conservative, as Maili lots were less expensive than lots in urban Honolulu.

In his Declaration, Rothstein referred to Judge Hifo's 2009 Liability Order, which stated, citing DHHL witness Darrell Yagodich's testimony, "[t]he residential homesteads likewise have been trimmed from 7,500 square feet on Oahu in 1983 to a smaller 5,000 square feet[.]"

The circuit court's overall damages model uses FMRV as the basis for calculating each residential claimant's overall damages.[12]  The circuit court did not err in using the FMRV of the Ma'ili lot as the basis for calculating the entire subclass's

---

[12]   In the October 7, 2014 Trial Order, the circuit court ordered,

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED that for purposes of calculating damages for claimants who applied for Oahu residential leases under the February 14, 2013, Order, the "Best Fit" model as set forth in Exhibit D-40 shall be used to determine the fee simple values to calculate annual fair market rental values.  This model comprises (i) annual rental values based on four percent (4%) of the fee simple value of the land area of a 5,000 square foot lot in Maili for any given year; (ii) rents adjusted annually; and (iii) a "best fit" model derived from actual fee simple Maili valuations from 1959 through July 8, 2013 (as shown on Exhibit D-2); (iv) with no increases for the consumer price index ("CPI") or present value adjustments.

damages. The circuit court chose a representative lot on which to base damages to satisfy the HRCP Rule 23(b) requirement that class action damages be capable of being measured class-wide. Nothing in the record indicates that a 5,000-square-foot lot in Ma'ili is inappropriate for purposes of calculating class-wide damages. The State presented no evidence that compares land values in Ma'ili to land values in other homestead locations on O'ahu or the neighbor islands.[13]

Based on the record before this court, we hold that the circuit court did not err in selecting the Ma'ili lot as the sample residential lot on which class-wide damages will be based.

3. **All waitlisted beneficiaries are entitled to damages pursuant to the FMRV Model, subject to the State's rebuttal.**

The HHCA envisioned the creation of a public land trust that would return Native Hawaiians to the land and prevent further displacement of the Hawaiian people. Hawaiian Homes Commission Act, ch. 42, sec. 101, 42 Stat. 108, 8-9 (1920). However, the federal government, and later the state government, which took over the role of trustee in 1959, mismanaged the

---

[13] In addition, the State has not appealed the circuit court's rulings that applied a statewide measure of agricultural and pastoral damages based on lots on the islands of Maui and Hawai'i, respectively.

Trust by misappropriating home lands for non-beneficiary use, failing to restore the lands or compensate the trust, and failing to keep adequate records.  Rather than placing beneficiaries on homestead lots, the State placed beneficiaries on a long waitlist.  The waitlist for leasing home lands grew and continued to grow.

In 2009, the circuit court found that the State breached its trust duties to keep and render accounts, exercise reasonable care and skill, administer the trust, and make the trust property productive.  The circuit court also found that these breaches caused eligible Native Hawaiians to remain on the waitlist and suffer damages as a result.  The circuit court specifically identified the need for further proceedings to determine the amount of damages, however, and the State now contests the method for determining damages that the circuit court established.

It is clear to us that the State, by mismanaging the Trust, failing to keep adequate records, and continuing to litigate this case for decades, is responsible for creating a situation in which it will be difficult to accurately assess damages.

Classic principles of trust law shift the burden to the trustee, once a beneficiary has proven that breach of trust

duties occurred and that loss resulted, to prove that the amount of damages should be limited as a result of the beneficiary's action or circumstance. See George Gleason Bogert et al., Bogert's The Law of Trusts and Trustees § 871 (2020) ("If the beneficiary makes a prima facie case, the burden of contradicting it or showing a defense will shift to the trustee."); see also Restatement (Second) of Trusts § 172 cmt. b (Am. Law Inst. 1959) ("The burden of proof is upon the trustee to show that he is entitled to the credits he claims, and his failure to keep proper accounts and vouchers may result in his failure to establish the credit he claims."). Indeed, Hawai'i has recognized that the nature of the case may warrant a lesser degree of certainty with respect to the amount of damages and that, if the fact of damages is established, "a more liberal rule is allowed in determining the amount." Coney, 39 Haw. at 139.

In addition to the traditional principles of burden-shifting in the context of damages on which we base our holding, we are mindful of our previous holding in Kalima I that Chapter 674 should be "liberally construed to suppress the perceived evil and advance the enacted remedy" and should not be narrowly interpreted to "impede rather than advance the remedies" provided by the statute. 111 Hawaiʻi at 100, 137 P.3d at 1006

41

(quoting Flores, 70 Haw. at 12, 757 P.2d at 647).

We adopt the FMRV Model and hold that every trust beneficiary is entitled to damages, pursuant to that model, for the years during which the beneficiary was on the waitlist. We hold that the State bears the burden of proving that individual beneficiaries are entitled to reduced damages for any reason.

The State has argued that individual beneficiaries must show, for example, that the beneficiary spent money out of pocket renting alternative land, that the beneficiary did not refuse a homestead offer, that the beneficiary mitigated their damages, and that the beneficiary is part of the defined subclass.

Establishing this proof will be prohibitively difficult for beneficiaries, who are not at fault for the time that has passed or the State's failure to administer the Trust. Instead, the State must shoulder this burden by proving to the Special Master that individual beneficiaries' damage awards should be reduced after damages are calculated by the FMRV damages model.[14]

---

[14] The parties raise numerous issues surrounding mitigation, including what it means for a beneficiary to have deferred from participation in a homestead offering and to what extent beneficiaries mitigated their damages. Each beneficiary's factual scenario surrounding these issues will be different based on the beneficiary's individual experience attempting to secure a homestead from the State. "In contract or in tort, the plaintiff has a duty to make every reasonable effort to mitigate his damages. The burden, however, is

(continued. . .)

**B. The circuit court correctly ruled that adjusting damages to present value constitutes an award of prejudgment interest in violation of HRS § 661-8.**

The circuit court adhered to the HRS Chapter 674 actual damages requirement by ruling that damages will not be adjusted to present value. The circuit court correctly ruled that the damages model does not provide for "increases for the consumer price index ('CPI') or present value adjustments."

The adjustment of damages to present value to account for inflation would impermissibly award Plaintiffs prejudgment interests in violation of HRS § 661-8 (2016). HRS § 661-8, which precludes prejudgment interest against the State, provides, "[n]o interest shall be allowed on any claim up to the time of the rendition of judgment thereon by the court, unless upon a contract expressly stipulating for the payment of interest, or upon a refund of a payment into the 'litigated claims fund' as provided by law."

---

upon the defendant to prove that mitigation is possible, and that the injured party has failed to take reasonable steps to mitigate his damages." Malani v. Clapp, 56 Haw. 507, 517, 542 P.2d 1265, 1271 (1975) (internal citations omitted). As such, the State bears the burden of proving a that a beneficiary failed to mitigate damages and that the beneficiary's damages should therefore be reduced. The Special Master shall make the final damages calculation. Plaintiffs concede that "[t]he only event that would legally limit a class member's claim to damages for 'failure to mitigate' consistent with the rules would be the Beneficiary's refusal to select a lot after being offered an award and a lease." Accordingly, we hold that, in order to carry its burden of proving that a beneficiary failed to mitigate damages, the State must prove that it specifically offered a homestead award and lease to that beneficiary and that the beneficiary thereafter refused to select a lot.

This court has defined prejudgment interest as "compensation for the delay in payment of money damages which is measured from accrual of the claim for relief until final judgment[.]" Rodrigues v. State, 52 Haw. 156, 169, 472 P.2d 509, 518 (1970). Adjusting for inflation, or bringing damages up to present value, would compensate Plaintiffs for the passage of time between the moment they suffered loss to the time of final judgment. As such, adjusting for inflation constitutes prejudgment interest.

In Library of Congress v. Shaw, 478 U.S. 310 (1986) (superseded by statute), the United States Supreme Court confirmed that inflation adjustment is not a separate damages principle, but is part of calculating prejudgment interest. There, evaluating damages against the government where a pre-judgment interest prohibition similar to HRS § 661-8 existed, the Court held that "whether the loss to be compensated . . . stems from an opportunity cost or from the effects of inflation, the increase is prohibited by the no-interest rule. In essence, the inflation factor adjustment is a disguised interest award." Id. at 322 (emphasis added) (internal quotations and citations omitted).

This court's definition of prejudgment interest, viewed together with the United States Supreme Court's

observation about the relatedness of inflation and prejudgment interests, indicate that the adjustment of Plaintiffs' damages to account for inflation in this case would impermissibly constitute prejudgment interest.  See Rodrigues, 52 Haw. at 169, 472 P.2d at 518 and Library of Congress, 478 U.S. at 322.

Moreover, prejudgment interest does not constitute actual damages and is therefore precluded by HRS Chapter 674. Actual damages do not include the amount that a beneficiary would have paid toward renting alternative land had they rented that land now.  Plainly, awarding beneficiaries more than what they actually paid toward alternative lands would result in awards that exceed beneficiaries' actual damages.  Therefore, adjusting beneficiaries' damages for inflation would also run afoul of HRS Chapter 674.

The circuit court correctly ruled that damages may not be adjusted to present value, as doing so would constitute the award of prejudgment interest in violation of HRS § 661-8 and would contravene the express actual damages limitation of HRS Chapter 674.

**C.  The circuit court erred in ruling that damages will not begin to accrue until six years after DHHL received a beneficiary's homestead application.**

Both parties argue that the circuit court incorrectly ruled that a beneficiary's damages did not begin to accrue until

45

six years after DHHL received that beneficiary's homestead application.

On January 24, 2012, the circuit court entered an Order Re Parties' Damages Model.  In the Order, the circuit court found, inter alia, "for purposes of the computation of damages[,] the time to run would start at the earliest six years from the date a beneficiary's application is accepted for placement on the list to receive homesteads."  The circuit court based its ruling on the following testimony of Henderson, "assuming [they] had the resources available to them, the normal development process [] probably [takes] five to six years." Henderson also testified:

> DHHL's position [on what constitutes placement on the land in a prompt and efficient manner, specifically, the number of years between an application and an award] is that certainly, again, assuming you had the resources available to them, the normal development process is probably five to six years.  I mean, that's not, you know – I mean, yeah, you talk to any developer in the private market, in the private sector, they probably would tell you the same thing.
> I mean, planning, permitting, engineering plans, offsite, onsite construction, et cetera, home reconstruction, we are looking at a period of five to six years."

While the court may be liberal in its determination of the amount of damages after liability is established, especially where the uncertainty was caused by defendant's wrongdoing, see Exotics Hawai‘i-Kona, 116 Hawai‘i at 292, 172 P.3d at 1036, "[t]he extent of plaintiff's loss must be shown with reasonable certainty and that excludes any showing or conclusion founded

upon mere speculation or guess." Ferreira v. Honolulu Star-Bulletin, Ltd., 44 Haw. 567, 576, 356 P.2d 651, 656 (1960).

Here, there is not a sufficient basis in the record to support the circuit court's ruling, as it appears that Henderson's testimony amounts to "mere speculation or guess." See id. First, Henderson's testimony assumes that DHHL had access to all necessary resources. In fact, the circuit court specifically found that "the major drawback to awarding homesteads was insufficient DHHL funds to complete site development, compounded by the poor quality or relatively remote locations of land thus requiring greater development expenses." (Emphasis added). Henderson's testimony does not, therefore, reflect the conditions under which DHHL actually operated. Second, while Henderson testified on behalf of DHHL at trial, he is not an expert on land development and did not proffer concrete reasons to support his estimate. Henderson simply asserted that a private market developer would agree with his estimate and cited various factors that could delay the development process. Henderson's assertions are based on speculation and false assumption.

In addition, nothing in the record indicates that the development process timeline is in any way connected to the timing of when an applicant was placed on the waitlist. In

47

other words, the State did not begin to develop a homestead plot each time a new beneficiary applied for a homestead. Even if six years is an accurate development delay estimate, that delay did not commence each time a claimant was placed on the waitlist. Therefore, there is no logical reason why the State should be allotted a six-year grace period between when the applicant was placed on the waitlist and when damages began to accrue.

The circuit court adopted the six-year rule based on Henderson's "mere speculation or guess." See Ferreira, 44 Haw. at 576, 356 P.2d at 656. In addition, the homestead development process timeline appears to be unrelated to the timing of when claimants filed their applications. In light of the foregoing, the circuit court erred in adopting the six-year rule. We vacate the Order Re FMRV Model to the extent that it adopted the six-year rule.

**D. The circuit court did not err in finding that the State breached its trust duties by failing to recover lands that were withdrawn from the Trust before statehood.**

The circuit court correctly found that the State breached its trust duties by failing to recover lands that were withdrawn from the Trust prior to statehood.

The State argues that the circuit court erred in finding that the State breached its trust duties by not

48

recovering lands that were withdrawn from the Trust by the federal government prior to Statehood.  The State asserts that it would have been "a legal impossibility for the State to recover those lands from the federal government" because the federal government did not waive its sovereign immunity against suits to resolve title issues to land until the passage of the Quiet Title Act (QTA) in 1972 and because "[p]ost-1972, claims to recover the trust lands would have faced the QTA's 12-year statute of limitations."  (citing 28 U.S.C. 2409a(i) (as amended by Pub. L. 99-598, November 4, 1986)).  As such, the State argues that it "had no duty to pursue a futile action against the federal government."

Plaintiffs counter that the State "wrongfully assumes that the only means of remedying its trust breaches was litigation against the federal government."  Plaintiffs further contend that, in light of undisputed facts in the record, the circuit court correctly found that the State "breached its duties to compensate the trust for wrongfully taken lands or return the lands to the trust at the assumption of its trust duties."

Between 1922 and 1969, the federal government and later the State alienated or "set aside" trust lands – that is, the State used Hawaiian home lands for purposes not permitted by

the Trust.  When the Territory of Hawai'i became a state in 1959,
the State of Hawai'i took over the management and disposition of
the Hawaiian home lands, including those that had been set aside
by the federal government.  Kalima I at 87, 137 P.3d at 993.
The State thereafter breached its trust duty either to restore
those lands to the Trust or compensate the Trust.

> Defendant State's failure for 25 years (1959-1984) to correct
> its own and the predecessor trustees' illegal "set asides" by
> cancellation or withdrawal of those executive orders or
> proclamations together with Defendant State's failure
> throughout the claims period to restore lands to the trust
> and to compensate the trust for fair rent during the period
> of non-beneficiary State use of trust lands were breaches of
> trust and trust duties set forth in Sections 170, 174, 175,
> 176, 177, 179, 181, 223 [of the Restatement [Second] of
> Trusts].

The circuit court found that the State breached the
Trust as follows:

In other words, the State breached the Trust by failing to
correct the ongoing dispossession of trust lands, which it could
have done by cancelling and withdrawing executive orders.
Accord Ching v. Case, 145 Hawai'i 148, 170, 449 P.3d 1146, 1168
(2019) ("The most basic aspect of the State's trust duties is
the obligation 'to protect and maintain the trust property and
regulate its use.'") (quoting State ex rel. Kobayashi v.
Zimring, 58 Haw. 106, 121, 566 P.2d 725, 735 (1977)).  The State
also breached its trust duties by failing to restore those lands
to the Trust and by failing to compensate the Trust for the

lands' rental value while in use by non-beneficiaries.

Contrary to the implication of the State's position, the circuit court did not rule that the State was required to sue the federal government to recover those trust lands in order to avoid breaching the Trust. Accord Ching, 145 Hawai'i at 171, 449 P.3d at 1169 (holding that the State had a trust duty to monitor the federal government's noncompliance with its lease of public lands but did not have a trust duty to initiate an enforcement action). In fact, the State has previously restored alienated trust lands and compensated the Trust for non-beneficiary use without suing the federal government. In 1994, with the passage of Act 352, the State transferred 16,518 acres of trust lands from DLNR to DHHL and paid DHHL $12 million for uncompensated use of those lands. Essentially, the circuit court found that the State breached its trust obligation by failing to restore lands or compensate the Trust sooner.

Under the basic principles of trust law, a successor trustee is liable to a beneficiary for breach of trust if the trustee (a) knows or should know of a situation constituting a breach of trust committed by the trustee's predecessor and improperly permits it to continue; (b) neglects to take proper steps to compel the predecessor to deliver the trust property to the trustee; or (c) neglects to take proper steps to redress a

51

breach of trust committed by the predecessor. Restatement (Second) of Trusts § 223 (Am. Law Inst. 1959). The State knew of the federal government's misuse of trust lands and improperly permitted it to continue. In addition, the State neglected to take proper steps to redress the breach committed by the federal government as original trustee. The State is clearly, then, liable to the beneficiaries for breach of trust. See Rest. of Trusts § 223.

As a result, the circuit court correctly found that the State breached its trust duties by failing to take action to restore recovered land to the Trust upon Statehood in 1959.

**E. The circuit court did not err in establishing the subclass list.**

The State argues that the circuit court erred in establishing an overbroad subclass list. The State alleges that the circuit court found it liable to "numerous individuals who never had a viable claim against the State" because the circuit court "adopted Plaintiffs' list of subclass members in its entirety, despite the fact that it contains a large number of people who are categorically not entitled to relief, and despite the fact that it conflicts with the court's own class and subclass definitions." These individuals include claimants who settled with the Panel, claimants who failed to submit written notice of intent to sue by October 1, 1999, claimants who were

not on the homestead waitlist or who did not submit a waitlist claim, and claimants who do not satisfy the Native Hawaiian blood quantum requirement.

Plaintiffs argue that including these individuals was proper because "[e]xclusion of these individuals from the class adjudication process means that they would be free to pursue their own claims against [the State] and that there would be no res judicata effect on these claims[.]"  In addition, Plaintiffs note that until each claimant presents the claimant's evidence to the Special Master, there is no way for the circuit court to make factual determinations as to which claimants lack viable claims.

The June 6, 2007 subclass certification for purposes of liability defined the waitlist subclass as "[a]ll Chapter 674 plaintiffs who were on the [DHHL] waiting list for a homestead and who submitted a claim to [the Panel] because they were not awarded a homestead in a prompt and efficient manner."

On July 26, 2017, the circuit court granted Plaintiffs' Motion to Establish Claims Administration Process and appointed a Special Master to perform the ministerial work of processing all subclass members' damages claims.  The order also stated, "[a]n amended 54(b) judgment shall be entered on each claim after the completion of the periods set by the Court

for review of the returned claim by the Claims Administrator and Special Master, if any."

The circuit court adopted Plaintiffs' proposed waitlist subclass list, which was compiled "from a print out of an Excel spreadsheet prepared by the Hawaiian Claims Office (HCO) listing every individual who filed a claim with the HCO Panel."

The circuit court correctly adopted the list in order to bind all persons who could pursue a claim as a waitlist member to the judgment in this case. Importantly, the class list includes all persons who filed a claim with the Panel. Now that the class has been established, each person on the class list will go through the claims administration process, where the Special Master will determine whether that person does or does not have a viable claim. The claim of any persons who fail to meet the subclass definition, for example, because they already settled their claim, or are excluded by statute, for example, because they do not meet the Native Hawaiian blood quantum requirement, will be excluded. At that time, individual judgment will be entered against disqualified claimants and they will be precluded from relitigating their non-viable claims.

HRCP Rule 23(c)(3) (2011)[15] provides that a judgment can only bind and preclude persons who are members of a class. As Plaintiffs note, "exclusion of these individuals from the class adjudication process means that they would be free to pursue their own claims against Defendants and that there would be no res judicata effect on these claims because they were not litigated and reduced to judgment." Therefore, although some of these class members may not have viable claims, it is appropriate to include them in the class in order to preclude them from attempting to relitigate their non-viable claims.

Moreover, inclusion in the subclass list does not mean that a claimant is entitled to damages. Claimants bear the burden of proving that they are qualified to receive damages. The court appointed a Special Master to make factual determinations, based on evidence, as to which claimants are

---

[15] HRCP Rule 23(c)(3) provides,

> **(c) Determination by Order Whether Class Action to be Maintained; Notice; Judgment; Actions Conducted Partially as Class Actions.**
>
> . . . .
>
> > (3) The judgment in an action maintained as a class action under subdivision (b)(1) or (b)(2), whether or not favorable to the class, shall include and describe those whom the court finds to be members of the class. The judgment in an action maintained as a class action under subdivision (b)(3), whether or not favorable to the class, shall include and specify or describe those to whom the notice provided in subdivision (c)(2) was directed, and who have not requested exclusion, and whom the court finds to be members of the class.

entitled to damages.  Any subclass member whose claim is excluded because it is not viable will not be entitled to damages.

The circuit court did not err in establishing the subclass list.  The class has been certified, and the class list is established.  Each class member's individual entitlement to damages will be determined, and no subclass member who is "categorically not entitled to relief" will obtain damages or a favorable judgment.

## IV. CONCLUSION

We resolve the foregoing issues as follows.  We (1) affirm the February 14, 2013 Order Re FMRV Damages Model in accordance with the preceding analysis; (2) affirm the October 7, 2014 Trial Order adopting the best fit curve and denying increases for CPI or present value adjustments; (3) affirm the September 22, 2016 order selecting the Ma'ili lot as the sample residential lot to be used statewide; (4) vacate the January 24, 2012 order establishing the "six-year rule;" (5) affirm the November 3, 2009 liability order finding that the State breached its trust duties by failing to correct ongoing dispossession of trust lands; and (6) affirm the June 6, 2007 order certifying

the waitlist subclass.  We further hold that the State bears the

burden of proving that a beneficiary failed to mitigate damages.

Clyde J. Wadsworth,
Kimberly T. Guidry,
Robert T. Nakatsuji, and
Kalikoʻonalani D. Fernandes
for Defendants-Appellants/
Cross-Appellees

Carl M. Varady and
Thomas R. Grande for
Plaintiffs-Appellees/
Cross-Appellants

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Richard W. Pollack

/s/ Michael D. Wilson

/s/ Matthew J. Viola

